**ESKIMO PIE CORPORATION, Plaintiff,**

v.

**WHITELAWN DAIRIES, INC., Supermarket Advisory Sales, Inc., Allstate Dairies, Inc., Jack Nelson and Henry Landau, Defendants.**

**WHITELAWN DAIRIES, INC. and Supermarket Advisory Sales, Inc., Plaintiffs,**

v.

**ESKIMO PIE CORPORATION, Imperial Ice Cream Novelties, Inc., Harry L. Darnstaedt, M. H. Renken Dairy Co., and Food Enterprises, Inc., Defendants.**

Nos. 64 Civ. 3702, 64 Civ. 3718.

United States District Court
S. D. New York.

April 16, 1968.

See also D.C., 266 F.Supp. 79.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for Eskimo Pie Corp., Walter C. Lundgren, New York City, of counsel.

Jaffin, Schneider, Conrad & Rubin, New York City, for Whitelawn Dairies, Inc., Supermarket Advisory Sales, Inc., Allstate Dairies, Inc., Jack Nelson and Henry Landau, Martin L. Conrad, New York City, of counsel.

Gifford, Woody, Carter & Hays, New York City, for Imperial Ice Cream Novelties, Inc. and Harry L. Darnstaedt, Edmund S. Purves, New York City, of counsel.

Schneider & Artz, New York City, for M. H. Renken Dairy Co., Samuel S. Schneider, New York City, of counsel.

MANSFIELD, District Judge.

Pursuant to Rule 2 of the General Rules of this Court, these consolidated actions have been assigned to one judge for all purposes. A series of pretrial conferences have been held for the purpose of simplifying the issues and taking up other matters that may aid in the disposition of the actions, including the possibility of separate jury trials of certain issues pursuant to Rule 42(b), F.R.Civ.P., and the determination of evidentiary questions anticipated at such trials. This decision deals principally with the procedure to be followed by the parties in obtaining rulings with respect to certain evidence to be offered at trial.

The actions arise out of written contracts between Eskimo Pie Corporation ("Eskimo" herein), Whitelawn Dairies, Inc.[1] ("Whitelawn" herein) and Supermarket Advisory Sales, Inc.[1] ("SAS"

---

1. Whitelawn and SAS are subsidiaries of Allstate Dairies, Inc. ("Allstate" herein), also named as a party in these proceedings.

herein) (Whitelawn and SAS are collectively referred to herein as "Whitelawn-SAS") entered into on or about December 30, 1960, and modified in various respects in 1961 and 1962. These contracts are referred to by the parties as the "Package Deal." All parties agree that the Package Deal is an integrated agreement setting forth in several writings all of the essential terms agreed upon by Eskimo and Whitelawn-SAS. Under the terms of the Package Deal Eskimo granted to Whitelawn, an ice cream manufacturer, the right to manufacture certain ice cream products bearing "Eskimo" wrappers and labels and to SAS the right to purchase such Eskimo-branded products from Eskimo or an Eskimo-authorized manufacturer for sale in the New York City Metropolitan Area as follows:

"During the term of this Agreement [SAS] shall have the *non-exclusive* right to purchase the Eskimo stock and stickless products listed in Exhibit A hereto, which may be amended from time to time by addition or deletion, from Eskimo or from a manufacturer authorized by Eskimo to manufacture such products within the New York City metropolitan area * * *." (emphasis supplied).

The present lawsuits were instituted after Eskimo, beginning sometime in 1962 and 1963, sold its Eskimo-branded products to others in the New York City Metropolitan Area, and entered into agreements with M. H. Renken Dairy Co. ("Renken" herein) to manufacture, and with Food Enterprises, Inc. ("Food Enterprises" herein) to sell, such products, and assisted Harry L. Darnstaedt and Imperial Ice Cream Novelties, Inc. ("Imperial" herein) in selling such products in the New York City Metropolitan Area. This led to a deterioration in the relationship between the parties to the Package Deal; a purported termination by Whitelawn and SAS of purchases and sales thereunder; and mutual claims of breach of contract, since Whitelawn and SAS appear to have refused to accept and pay for certain products.

The Eskimo action sets forth eight claims, seven of which are for breach of the aforementioned contracts (including two claims for goods sold and delivered thereunder) and an eighth claim for reformation of a written agreement dated April 27, 1962 between Eskimo and SAS, that forms part of the Package Deal. Except for general denials, the Whitelawn-SAS answers admit the sale and delivery of certain goods and assert offsets and counterclaims which also form the basis of the Whitelawn-SAS suit against Eskimo and other defendants.

The Whitelawn-SAS complaint sets forth six claims, the first two against Eskimo for breach of the Package Deal, the next three against other defendants (Renken, Darnstaedt, Imperial and Food Enterprises, no longer a defendant) for inducing such breach, and a sixth charging Eskimo, Darnstaedt and Imperial with missappropriation of trade secrets belonging to Whitelawn. Except for admitting the execution of the instruments constituting the Package Deal, Eskimo and other defendants in the Whitelawn-SAS action deny the material allegations.

All parties have agreed that trial of the issues arising out of the Whitelawn-SAS claim for misappropriation of trade secrets, and trial of all damage issues, may be deferred pending a trial of the liability issues raised by the parties in their respective pleadings.

A threshold question, which appears to be central to the entire dispute between the parties, arises out of the meaning of the word "non-exclusive" as used in the above quotation from the Package Deal, and the proposal of Whitelawn-SAS to offer parol evidence with respect to its meaning. Whitelawn and SAS contend that the word "non-exclusive" as used in the Package Deal meant that Eskimo would have the right to continue existing licenses granted by it to others in the New York City Metropolitan Area and to grant new licenses to national companies (such as the Borden Company, National Dairy Products Corporation), but not to grant licenses to so-

called "independent" companies unless required to do so by order of a court or governmental agency, and that Eskimo itself was not to compete with Whitelawn and SAS in the sale of Eskimo-branded ice cream products. Eskimo denies such contentions as to the meaning of the word "non-exclusive" and asserts that it plainly meant that Eskimo was granting a bare non-exclusive right to Whitelawn and SAS to manufacture and sell Eskimo products, while retaining the unfettered right to license others as it saw fit to manufacture and sell Eskimo-branded ice cream products.

Whitelawn-SAS proposes, upon the jury trial of the issues of liability raised by the two lawsuits, to introduce not only the written agreements constituting the Package Deal, but also parol and extrinsic evidence as to what the parties understood and intended the term "non-exclusive" to mean, including earlier drafts of the Package Deal, correspondence and conversations between the parties leading up to its execution, and subsequent conduct of the parties, including a letter written by Darnstaedt on February 12, 1963 stating that the parties "had a gentlemen's agreement that Eskimo would not solicit any stick franchises in New York City except any of the national companies that Eskimo is serving around the country." More specifically, Whitelawn-SAS would offer testimony of its lawyers and others who negotiated the Package Deal on its behalf to the effect that earlier drafts, including one submitted by an Eskimo official named Gunn (now deceased) contained a clause which would have obligated Eskimo not to license or franchise the Eskimo mark, or sell Eskimo-branded ice cream products, to anyone in the New York City Metropolitan Area other than existing licensees or national dairy organizations, unless Eskimo should be required to do so by court or governmental order; that thereafter Eskimo refused to sign an agreement containing the express clause because of a fear expressed by Eskimo's counsel that the proposed clause might violate the federal antitrust laws; and

that accordingly, after a series of conferences, the proposed clause was deleted on the understanding that its meaning would be deemed incorporated into the word "non-exclusive" used in the above-quoted license to Whitelawn-SAS.

Although Eskimo, if such parol evidence were admitted at the trial, would offer testimony of its officials contradicting that of the Whitelawn-SAS negotiators, it argues that such evidence is barred by the parol evidence rule, and seeks preliminary rulings before trial is commenced.

Eskimo's earlier attempts to obtain a determination of this and other issues by way of motions to dismiss and for summary judgment were unsuccessful, two distinguished members of this Court (Judges Levet and Palmieri) properly taking the view that the questions should await further inquiry by the trial judge, since the Court on such motions was required to view the facts most favorably to Whitelawn-SAS, which opposed the motions. In his opinion Judge Levet stated:

> "However, this is not a determination in any respect with regard to the admissibility or the non-admissibility of any evidence with respect to the terms of any written contract. These matters are wholly for the disposition of the court at trial."

Judge Palmieri's later decision was grounded in part on a position then taken by Whitelawn-SAS, but since withdrawn by it in a pretrial conference with the trial judge, to the effect that

> "a crucial issue is presented as to whether the written agreements of the parties are the full measure of their legal relationships."

All parties now agree that the Package Deal represented an integrated agreement. Judge Palmieri was also under the impression that § 2–202 of New York's Uniform Commercial Code would permit the introduction at trial of evidence as to course of dealing, usage of trade, or course of performance, the issue of retroactivity of that section not

having been raised. For reasons set forth below we conclude that the section does not apply to the introduction of parol evidence with respect to the contracts here involved, which predated its enactment.

▮ The question of whether parol evidence should be admitted at trial is one of law to be determined and ruled upon by the Court. See James, Civil Procedure § 7.10, at 267 (1965); Weiner, The Civil Jury Trial and the Law-Fact Distinction, 54 Calif.L.Rev. 1867, 1870 n. 12 (1966). Normally such rulings are made when the evidence is offered during trial, with the party offering the evidence, should objection be sustained, preserving his rights through an offer of proof out of the jury's presence. In this case, however, Eskimo asserts that since the parol evidence to be offered is extensive (both parties agreeing that if the evidence is admitted several witnesses will be required to testify for at least a few days), Eskimo would be forced to engage in multiple and continuous objections to, and/or motions to strike, testimony as to each of the numerous conversations between the negotiators, and proof of each item of correspondence, drafts, etc., with the result that even if the evidence should ultimately be excluded, Eskimo would be unduly prejudiced before the jury. This argument has much merit and is supported by those who follow the practice in such cases of holding a preliminary hearing for the purpose of ruling on the admissibility of such evidence. Wigmore on Evidence § 1808 at 275–76 (3d ed.). Whitelawn-SAS contends, however, that since the parol evidence should be admitted at trial, a preliminary hearing would result in needless waste and expense occasioned by duplication in testimony and proof. In view of these opposing contentions, consideration by the Court at this time of the applicable evidentiary principles seems appropriate.

All parties agree that in this diversity suit the admissibility of the parol and extrinsic evidence to be offered by Whitelawn-SAS is governed by the law of the State of New York, where Whitelawn and SAS are incorporated and have their principal places of business, where Eskimo is authorized to do business, where the agreements involved were for the most part negotiated, and where they were to be performed.

Whitelawn-SAS argues that parol evidence should be admitted on the ground that the term "non-exclusive" is ambiguous, and that even if it in fact lacks ambiguity such evidence may be received to show that the parties gave the term special or particular meaning not to be gathered from the language by a reasonably intelligent person having knowledge of the custom, usage and surrounding circumstances. In support of their position, Whitelawn-SAS relies principally on § 2–202 of the Uniform Commercial Code ("UCC" herein), Corbin on Contracts §§ 535, 536, 542, 543, 579 and decisions of the late respected Judge Frank, e. g., United States v. Lenox Metal Manufacturing Co.,[2] 225 F.2d 302 (2d Cir. 1955); R. H. Johnson & Co. v. SEC, 198 F.2d 690, 696 (2d Cir.), cert. denied, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952).

Section 2–202 of New York's UCC provides:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208) * * *."

2. The other two members of the panel, Judges Medina and Hincks, did not find it necessary, in separately concurring in this decision, to subscribe to Judge Frank's views as to the admissibility of parol evidence.

■ The effective date of the section is September 27, 1964, which postdates the Package Deal. Section 10–102 (2) of the UCC provides:

"Transactions validly entered into before the effective date specified in Section 10–105 of this Act and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law repealed or modified by this Act as though such repeal or modification had not occurred * * *."

Since the Package Deal predated the effective date of the UCC, and since the UCC was not intended to have retroactive effect, § 2–202 does not apply and the Court must look to prior law. Although there is a well established exception to the usual non-retroactivity of legislation affecting contract rights and obligations, namely, that the parties do not have a vested right in a rule of procedure, e. g., United Securities Corp. v. Bruton, 213 A.2d 892 (D.Col.Ct.App.1965), in view of the fact that the parol evidence rule is a substantive rule of law,[3] and not evidentiary as its name would seem to imply, Fogelson v. Rackfay Constr. Co., 300 N.Y. 334, 90 N.E.2d 881, 882 (1950) (Fuld, J.); Zell v. American Seating Co., 138 F.2d 641 (2d Cir. 1943) (applying New York law); Palmer v. Nissen, 256 F.Supp. 497, (D.Me.1966); Corbin on Contracts § 573 (1964 Supp.); Morgan, Evidence iv, 339 (1962); American Law Institute, Restatement of Contracts, Vol. I, § 237, p. 332 (1932), the UCC's parol evidence rule (§ 2–202) cannot apply to this pre-UCC transaction.

■■ In any event even if § 2–202 of the UCC were applicable to the written contract here at issue, much of the proof which Whitelawn-SAS would offer to show what the parties intended the word "non-exclusive" to mean would not be admissible. Section 2–202 limits the

parties, in explaining the meaning of language in a written integrated contract, to proof of a "course of dealing," "usage of the trade," and a "course of performance." None of these terms encompass testimony or other proof as to the subjective intent of the parties. The term "course of dealing" as defined in § 1–205(1) refers to "previous conduct between the parties" indicating a common basis for interpreting expressions used by them. In short, proof of such conduct is limited to objective facts as distinguished from oral statements of agreement. Likewise the term "usage of trade" is defined in § 1–205(2) as

"any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court."

The comments of the drafters as well as those of independent commentators make it clear that "usage of the trade" refers to evidence of generalized industry practice or similar recognized custom, as distinguished from particular conversations or correspondence between the parties with respect to the terms of the agreement. UCC § 1–205, Official Comment 5; Levie, Trade Usage and Custom Under the Common Law and the Uniform Commercial Code, 40 N.Y.U.L.Rev. 1101, 1106–09 (1965). The same general conclusions must be reached with respect to proof of a "course of performance."

As previously noted, the admissibility of parol evidence in this case is governed by the law of New York as it existed prior to the effective date of § 2–202, and therefore this Court must first determine what New York law is on this question before embarking upon any ex-

---

3. The substantive effect of applying the parol evidence rule in the present case is confirmed by the statement of counsel for Whitelawn-SAS to the Court that un-

less the parol evidence offered by it is admitted—"I would say to you that I think our case folds completely." (Pretrial Conf., March 20, 1968)

pedition into unchartered territory which might permit consideration of advanced schools of semantic thought that have been espoused by Judge Frank and Professor Corbin, see, generally, Farnsworth, "Meaning" in the Law of Contracts, 76 Yale L.J. 939 (1967), but which have not obtained widespread judicial acceptance. As a learned member of the Second Circuit Court of Appeals, Judge Kaufman, has said:

"[T]he proper function of this Court is to ascertain what New York law is, and not to speculate about what it will be, or in Learned Hand's felicitous phrase, 'to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.' Spector Motor Service v. Walsh, 139 F.2d 809, 823 (2nd Cir. 1943) (dissent), vacated, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). It is certainly not our function to apply the rule we think better or wiser." (Hausman v. Buckley, 299 F.2d 696, 704, 93 A.L.R.2d 1340 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962))

▮ In this instance, ascertainment of New York law on the issue does not require "prolonged celebration." The courts of New York have never subscribed to the view that, in the absence of ambiguity, evidence as to the subjective intent of the parties may be substituted for the plain meaning that would otherwise be ascribed to the language of a written agreement by a reasonably intelligent person having knowledge of the surrounding circumstances, customs and usages. On the contrary, prior New York law adhered to time-honored objective standards to determine the meaning of language found in writings which represent as did the Package Deal here the final and complete integrated agreement reached by the parties. Oxford Commercial Corp. v. Fred Landau & Co., 12 N.Y. 2d 362, 239 N.Y.S.2d 865 (1963); Laskey v. Rubel Corp., 303 N.Y. 69, 100 N.E. 2d 140 (1951); Mitchell v. Lath, 247 N.Y. 377, 160 N.E. 646, 648 (1928). The cardinal principles forming the cor-

nerstone of those standards are (1) that the meaning to be attributed to the language of such an instrument is that which a reasonably intelligent person acquainted with general usage, custom and the surrounding circumstances would attribute to it; and (2) that in the absence of ambiguity parol evidence will not be admitted to determine the meaning that is to be attributed to such language. § 2–202 Comment 1(c); Oxford Commercial Corp. v. Landau, 12 N.Y.2d 362, 239 N.Y.S.2d 865, 867, 190 N.E.2d 230 (Ct.App.1963) (Fuld, J.); Arrathoon v. Pergament Oceanside Corp., 53 Misc. 2d 959, 281 N.Y.S.2d 263 (Sup.Ct.1965), affd., 19 N.Y.2d 923, 281 N.Y.S.2d 333, 228 N.E.2d 392 (Ct.App.1967) (4-to-3); Bayside Federal Savings & Loan Assn. v. Cord Meyer Dev. Co., 28 A.D.2d 866, 281 N.Y.S.2d 893 (2d Dept. 1967).

"The question is as to the fair and reasonable meaning that may be given to the writing sued on. Written words may have more than one meaning. 'The letter killeth but the spirit giveth life.' 2 Cor. 3:6. 'Form should not prevail over substance and a sensible meaning of words should be sought.' Atwater & Co. v. Panama R. R. Co., 246 N.Y. 519, 524, 159 N.E. 418, 419. But plain meanings may not be changed by parol, and the courts will not make a new contract for the parties under the guise of interpreting the writing. 'The fact that the parties intended their words to bear a certain meaning, would be immaterial were it not for the fact that the words either normally or locally might properly bear such meaning.' Williston on Contracts, § 613." Heller v. Pope, 250 N.Y. 132, 164 N.E. 881 (1928) (Pound, J.))

▮ Thus the oral statements of the parties as to what they intended unambiguous language in an integrated document to mean are excluded by the parol evidence rule, because the very purpose and essence of the rule is to avoid fraud that might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning, objectively interpreted in the light of surrounding

circumstances, customs and usage. The effect of admitting such testimony in the absence of some showing of ambiguity would be to permit a party to substitute his view of his obligations for those clearly stated. Where—as in the present case—some of the negotiators of the written agreement have died or are unavailable, the door could be opened to fraud. Accordingly, the view of the New York courts has been that an objective standard is essential to maintain confidence in the written integrated agreement as the medium for conducting commercial relations.

 The first question to be determined in the present case, therefore, is whether the term "non-exclusive" as used in the Package Deal is ambiguous, which must be decided by the Court. West Africa Nav. Ltd. v. Ore & Ferro Corp., 192 F.Supp. 651 (S.D.N.Y.1960); East Coast Electronics Co. v. Heller, 355 F.2d 923 (5th Cir. 1966). An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. Fox Film Corp. v. Springer, 273 N.Y. 434, 8 N.E.2d 23 (1937); Rochester Park, Inc. v. City of Rochester, 19 A.D.2d 776, 241 N.Y.S.2d 763 (4th Dept. 1963). In the absence of proof that the term "non-exclusive" could possibly have the meaning, among others, attributed to it by Whitelawn-SAS, parol evidence must be excluded.

Applying the foregoing principles, the word "non-exclusive" when used—as was the case here—in an integrated license agreement drafted by legal counsel, has an established legal meaning that is usually accepted in the absence of a qualifying context, custom, usage or similar surrounding circumstance. The term has repeatedly been defined as meaning that the licensee is granted a bare right to use the trademark or patent being licensed without any right to exclude others, including other licensees

taking from the grantor, from utilizing the mark or invention involved. Contracting Division, A. C. Horn Corp. v. New York Life Ins. Co., 113 F.2d 864, 865 (2d Cir. 1940); N. V. Philips' Gloeilampenfabrieken v. Atomic Energy Commission, 114 U.S.App.D.C. 400, 316 F.2d 401, 409 (1963); Overman Cushion Tire Co., Inc. v. Goodyear Tire and Rubber Co., Inc., 59 F.2d 998, 1000 (2d Cir. 1932); Ackerman v. Hook, 183 F.2d 11, 15 (3d Cir. 1950); see Huber Baking Co. v. Stroehmann Bros. Co., 252 F.2d 945, 951, 953–954 (2d Cir. 1958); Ellis, Patent Licenses § 387 (1958). As Ellis points out:

"If a non-exclusive license is given there is by the very nature of the license an understanding that licenses may be granted to others. The number of licensees may run into hundreds * * *. [T]here is no implied agreement by the licensor that he will not grant licenses at lower royalties or that he will sue infringers. Both these two classes of persons constitute competition and the licensee by accepting a non-exclusive license has agreed to accept competition. If it is more severe than he had anticipated that is his fault for not having contracted against such competition."

 Despite the meaning thus usually ascribed by the law to the term "non-exclusive" Whitelawn-SAS urge that here the legal draftsmen intended it to have a contrary meaning, i. e., that subject to certain detailed and specific exceptions (The Borden Company, National Dairy Products Corporation, existing licensees and existing written commitments to others), and except to the extent that Eskimo might be required to deviate therefrom by court or governmental order, the term meant "exclusive." In a business world not noted for its economy of language (the Package Deal covers 70 typewritten pages, including amendments) no business reason, custom or usage is advanced for attaching such an elaborate and paradoxical meaning to the term "non-exclusive," when legal counsel negotiating for both sides could easily have spelled out such specifics in

comprehensible terms. Whitelawn-SAS's assertion that the term was used to conceal a detailed secret "gentlemen's agreement" that was feared by Eskimo to violate the antitrust laws hardly comports with the word's having a secondary meaning as a matter of generalized trade usage or custom. On the contrary, such evidence would indicate that the term, despite the definite and plain meaning usually attributed to it, was being used to express a particular, subjective meaning initially conceived by the parties solely for the purpose at hand, and not because the term would be recognized by others as having such a special meaning. Unless the language is meaningless on its face (e.g. "abracadabra") or ambiguous, however, the test for admission of parol evidence is not a secret code meaning given to it by the parties but whether it might objectively be recognized by a reasonably intelligent person acquainted with applicable customs, usages and the surrounding circumstances as having such a special meaning. For instance, would an executive in the ice cream business, who was not privy to the secret oral "gentlemen's agreement," recognize the term "non-exclusive" in this context and setting as granting an "exclusive" right, subject to certain exceptions or as having a meaning other than that usually attributed to it? If so, parol evidence would be admissible. If the law were otherwise, not only the term "non-exclusive" but every apparently clear term in a written agreement, such as a specific purchase price (e. g., "$10,000") could be changed by secret oral agreement to mean something different (e. g., "$25,000").

 Nevertheless, although the term "non-exclusive" as used in the Package Deal does not on its face appear to be ambiguous, Whitelawn-SAS will be afforded the opportunity to offer proof showing that the term is ambiguous, and Eskimo the opportunity to rebut such proof. In accordance with the principles hereinabove outlined, proof on the issue of ambiguity may encompass the terms of the Package Deal itself, the surrounding circumstances, common usage and custom as to the meaning attributed to it, and subsequent conduct of the parties under the Package Deal, but evidence of the subjective understanding of the parties as to the meaning attributed by them to the term "non-exclusive" will not be received.

Since the issue of ambiguity must be determined by the Court before ruling on the admission of parol evidence and since Eskimo might suffer prejudice if such rulings were made in the jury's presence, the proof with respect to ambiguity will be received at a preliminary hearing by the Court. Upon conclusion of the preliminary hearing, the Court will rule upon the issue of ambiguity, and the admissibility of the evidence at trial will be governed accordingly. Thereupon, pursuant to Rule 42(b), F.R.C.P., the Court will hold a separate jury trial of the issue of liability, to be followed by trial before the same jury of the damage issues, except with respect to issues raised by the sixth claim set forth in the Whitelawn-SAS complaint.

So ordered.