The CHASE MANHATTAN BANK, a national banking association, Plaintiff-Appellant,

v.

The FIRST MARION BANK, a banking corporation, Defendant-Appellee.

No. 29049.

United States Court of Appeals, Fifth Circuit.

Feb. 5, 1971.

George L. Hudspeth, Jacksonville, Fla., for plaintiff-appellant.

Harry C. Dozier, Virgil L. Milbrath, Ocala, Fla., for defendant-appellee.

Before TUTTLE, DYER and SIMPSON, Circuit Judges.

DYER, Circuit Judge:

Chase Manhattan Bank appeals from the District Court's dismissal, pursuant to Fed.R.Civ.P. 41(b), of its breach of contract action. Chase contends that the court erred in refusing to admit parol evidence concerning the circumstances surrounding, and duration of, an allegedly ambiguous subordination and standby agreement with First Marion Bank, defendant in this case. Because evidence should have been admitted to explain and supplement the terms of the written agreement, we reverse.

To understand the rationale for our decision, it is essential to consider this controversy in its complete factual context. Chase, First Marion, and thirty-three other institutions and individuals made separately transacted loans to various borrowers, collectively defined as the "Leitman Group." These loans, totalling

several million dollars, were partly secured by pledges of stock in VTR, Inc. Although VTR stock was traded on the American Stock Exchange, the Leitman Group owned approximately 65 to 70 percent of the outstanding shares. Apparently no lender was initially cognizant of the other loans; all lenders later discovered that they were pledgees of 67 percent of VTR's outstanding shares. Chase, which had loaned a total of $258,-900 to five members of the Leitman Group, held 90,411 shares of VTR stock as security. First Marion, which had loaned $90,000, held 11,000 VTR shares.

During 1965 the Securities and Exchange Commission brought suit in the Southern District of New York against members of the Leitman Group and VTR. The SEC charged that the Leitmans had diverted VTR funds and that the Leitman Group owed VTR substantial amounts of money. That the Leitmans were indebted to VTR was manifest in the corporation's books. Because of the gravity of this situation, the SEC demanded that the Leitmans repay the debt immediately; otherwise appointment of a receiver for VTR would be necessary. In September 1965, after the complaint was filed, the SEC and the Leitman Group entered a stipulation in which the Leitmans consented to the appointment of a receiver unless the amounts owed VTR were repaid within 30 days.

When news of the SEC's action was reported to the lenders holding VTR stock, they became concerned that appointment of a receiver would prove disastrous, presaging the ruin of VTR and a significant depreciation in the value of VTR stock held as security. At least some of the lenders concluded that the Leitman Group's precarious financial position would necessitate future utilization of the VTR collateral to recoup their loans. Thus, soon after the SEC and the Leitman Group had executed their stipulation, efforts to ensure repayment of the latter's debt to VTR began. The estimated debt amounted to $1,200,000, of which the Leitmans had repaid approximately $350,000. To avoid receivership, the $850,000 difference would have to be supplied.

One potential solution for the problem was "dividend" repayment, a method devised by the Leitmans' lawyer Arthur Christy. Christy secured an extension of the deadline for repayment, and in October 1965 proposed a plan whereby VTR would declare a dividend of one dollar per share of stock outstanding. This dividend would provide the Leitman Group with the $850,000 needed to repay VTR.

Meanwhile, officers of Chase—under the leadership of Frederick Bardusch, a Chase vice-president—took steps to ensure that no lender to the Leitman Group would act precipitously and thus endanger the value of the VTR collateral. Chase's lawyer Francis Musselman drafted a standby agreement, a common device used in problem loan cases when several creditors are involved. The standby agreement was premised on the understanding that each lender would refrain from

> unilaterally demanding payment of or suing upon the obligations of the Borrowers [Leitman Group] and from unilaterally selling or liquidating the collateral under its control to the end that the value thereof held by each may be preserved to the fullest extent possible * * *.

The agreement provided for the formation of a committee which would have authority to dispose of the VTR stock held as collateral by the lenders.

On October 29, 1965, a number of lenders met in New York to discuss the dividend method of repayment and the standby agreement. At this meeting Christy and Musselman explained their respective proposals.

On November 3, 1965, Christy presented his dividend plan to the District Court for the Southern District of New York. Counsel for the SEC voiced their objections to any such arrangement. The court, however, reserved decision. On November 4 Christy traveled to Washington to confer with the General Coun-

sel of the SEC. He hoped to gain acceptance of his proposal but found scant ground for accord.

That same day Christy flew to Jacksonville, Florida, where he reported to Bardusch and Musselman that the SEC had not seemed receptive to the dividend arrangement. It was apparent that an alternative plan of repayment would be required to circumvent receivership. However, there was a paucity of feasible solutions: the Leitman Group's free assets had already been pledged, and a pro-rata contribution to VTR from the lenders was impossible since some lenders had already exceeded their lending limits. Finally Christy suggested that Chase loan the Leitmans $850,000.

On November 5 Christy, Bardusch, and Musselman met in Jacksonville with all or most of the Southern lenders who had made loans to members of the Leitman Group and who held VTR stock as collateral. Although representatives of First Marion admittedly attended this meeting, the parties cannot agree as to what actually transpired. First Marion asserts that the parties were informed of the events to that point and discussed the standby agreement. Moreover, there was some discussion of a Chase loan to the Leitmans. Nevertheless, First Marion contends that its representatives made no affirmative commitment to any proposal or discussion. Chase's witnesses offered to flesh out this skeletal recollection of the meeting. According to Chase, it was noted during general discussion that a standby agreement was unfeasible if the specter of a receivership was not removed. The crux of the receivership problem continued to be the proper method of restoring $850,000 to VTR. The lenders then discussed the possibility of a Chase loan—predicated upon certain terms and conditions. These terms and conditions, allegedly delineated at the meeting while First Marion's representatives were in attendance, were two-fold: First, solution of the receivership problem was necessary; and second, security for the loan was essential. Since no alternative security was available, other lenders would be required to subordinate their loans to Chase's to the extent of one dollar per share of VTR stock held by them as collateral for their loans to the Leitman Group. Such subordination would ostensibly fully secure the Chase loan, because one dollar per VTR share already held as collateral totalled approximately $850,000. Chase further avers that during the meeting all lenders were polled as to the advisability of the loan and the subordination by other lenders in Chase's favor. Some immediately approved the subordination, while others indicated that they would have to obtain formal approval of the plan.

After a similar gathering with the New York lenders on November 10, Chase formally expressed to Christy its willingness to make the loan, if the one-dollar-per-share subordination agreement were executed by the lenders. Christy advised the Court of the prospective loan and requested additional time to allow Chase to reduce the proposal to the form of a commitment. On November 15 Chase sent its commitment letter to Christy. After reciting the background of the request for a receivership and the SEC's objections to the dividend arrangement, the letter listed the conditions under which Chase would lend $850,000 to members of the Leitman Group. These were:

a. The proceeds of the loan must be paid to VTR, Incorporated to discharge the liability of the defendants to make restoration and obviate the need for the appointment of a receiver, all with the approval of the court.

b. Banks which have previously loaned monies to the Leitman group, secured by said 848,166 shares of common stock of VTR, Incorporated, shall subordinate their claims against the Leitman group and with respect to the pledged shares to the claim of this bank (to the extent of $1 per share) for the repayment of the $850,000.00.

c. The members of the Leitman group shall enter into an Agreement with their secured and unsecured lend-

ers. The Agreemnt shall be substantially along the lines of the draft of Agreement previously furnished to you providing for the pooling of collateral and a committee of lenders to function for all of the lenders under the Agreement.

Chase contends that copies of this letter were sent to the lenders, including First Marion.

On November 18 the New York District Court determined that it would not appoint a receiver (on condition that the standby agreement be executed before December 3) and approved the terms of the proposed loan, as articulated in Chase's commitment letter.

The standby agreement which Musselman had drafted earlier contained no provision for the Chase loan or for subordination of the other lenders. Because of the urgency involved, Musselman merely sandwiched the loan and subordination agreement into the existing standby agreement. He did not even change the original numbering scheme, but designated the loan and subordination provisions as § 11.a and § 11.b.[1] Musselman advised the lenders—allegedly including First Marion—that the standby agreement was being revised "to substitute a

subordination by the Lenders secured by VTR stock to the extent of $1 per share in lieu of the provision in the Agreement permitting dividends aggregating $1 per share."

Subsequently all lenders and members of the Leitman Group executed the revised standby agreement, which included the loan and subordination provisions. On January 14, 1966, the Leitman Group delivered an $850,000 demand note to Chase. The note provided that it was issued pursuant to the agreement and specifically stated that it was "entitled to the benefits of certain subordination provisions" in the agreement.

Later Chase and most other parties to the agreement participated in a collective sale of VTR shares held by them as collateral. First Marion did not take part in the transaction. However, it sold its 11,000 shares of VTR stock on the open market between January and May 1968. Chase then demanded compensation under the subordination provisions of the 1965 agreement, and First Marion refused. The present action ensued.

In a non-jury trial, the District Judge ruled that the agreement lapsed by its own terms[2] no later than eighteen

---

1. Each Lender, including the Chase as Lender, agrees that the indebtedness of the [Leitman Group] primarily secured by shares of VTR (hereinafter sometimes called the "Subordinated Debt") shall be subordinate and subject in right of payment to the prior payment in full of the indebtedness evidenced by the Chase Note and agrees that it will not take or receive from said [Leitman Group], payment of the whole or any part of the Subordinated Debt held by it unless and until the indebtedness evidenced by the Chase Note shall have been fully paid, *provided, however*, this subordination as to each such Lender shall be limited to an amount equal to $1 times the number of shares of VTR stock now held by such lender as Collateral * * *.

In furtherance of, and to make effective, such subordination, the parties hereto agree that should any payment with respect to Subordinated Debt be received by any Lender to [the Leitman Group], the Lenders to such persons on the secur-

ity of shares of VTR stock will forthwith deliver the same to the Chase to the extent of an aggregate amount equal to $1 times the number of shares of VTR stock now held by such Lender as Collateral, for application on the indebtedness evidenced by the Chase Note, and, until so delivered, the same shall be held in trust by each such Lender as the property of the Chase.

2. The duration provision, § 12, provided in pertinent part:
When this Agreement has been executed by all of the [Leitman Group], and all of the Lenders, it shall become operative. Unless previously terminated as in § 13 provided, this agreement shall remain in full force and effect for a period of 12 months from the date hereof, *provided however*, that if the Committee, prior to the expiration of said period of 12 months, shall determine to extend the duration of this Agreement for a further period of not more than

months after execution date, and therefore Chase did not possess a lien on the VTR shares at the time First Marion sold its shares. He did not admit any of Chase's evidence concerning either the circumstances surrounding the development and drafting of the 1965 agreement or the conditions under which Chase agreed to make the $850,000 loan. Finding no ambiguity in the duration provision of the agreement, he applied the parol evidence rule to exclude all evidence except the agreement, the $850,000 note, and Chase's loan card. Moreover, he ruled all testimony proffered by Chase inadmissible, except the names and addresses of the witnesses and testimony with respect to the present balance of the Leitman Group's indebtedness. Consequently little remained to substantiate Chase's case, and the judge granted First Marion's motion for involuntary dismissal under Fed.R.Civ.P. 41(b). Concerned with whether the agreement was ambiguous as to duration of the subordination provision, the court ostensibly did not consider Chase's other theory of recovery: if the court determines that the subordination agreement terminated simultaneously with the standby agreement, the consolidated written agreement must not accurately reflect the true understanding of the parties and thus requires reformation.

To counter Chase's argument, First Marion points out that Chase initially contended during the trial that the final written agreement contained no ambiguity but that parol evidence was necessary for proper interpretation of the contract. Chase altered its position when the District Judge indicated that, absent a showing of ambiguity, he could interpret the final written agreement without the aid of parol evidence. Furthermore, First Marion argues that, because no mutual mistake existed, a reformation remedy was unavailable.

To even the most courageous Pickwickian, the parol evidence rule must

seem a treacherous bog in the field of contract law. Interspersed in this quagmire are quicksand-like state court decisions, which appear equitable in specific situations but remain perilous for legal precedent. Federal courts, attempting to clarify, have sometimes but confused and compounded muddled interpretation of the axiom.

■■ Thus we tread cautiously in this morass. Fortunately we need travel only the relatively sure path of New York law. Under the circumstances we shall not accept the parties' proffered invitations to explore the New York parol evidence rule in the context of Article 2 of the Uniform Commercial Code. This controversy concerns standby and subordination agreements, not a contract for the sale of goods. Thus Article 2 of the Code, which contains the parol evidence rule, becomes inapposite. *See* N.Y. Uniform Commercial Code § 2–102 (McKinney 1964). To determine whether parol evidence should have been admissible in this situation, we must review pre-Code explications of the rule. However, we must ascertain the present limits of that rule in light of the general provisions of the Uniform Commercial Code: while the Code's Article 2 parol evidence rule remains inapplicable in the instant case, its Article 1 general provisions have implicitly restricted the types of evidence excludable under the non-Code rule.

### I.

Before confronting the parol evidence rule, we define its limits. In this respect the Uniform Commercial Code is pertinent. In Article 1 the Code's general provisions state:

A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and *supplement or qualify terms of an agreement.*

6 months, then this Agreement shall, upon a declaration to that effect by the

Committee, remain in full force and effect during such further period.

*Id.* § 1–205(3) (emphasis added). The Code describes "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* § 1–205(1). "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts." *Id.* § 1–205(2).[3]

■ Certainly the parol evidence rule does not preclude evidence of course of dealing or usage of trade, for such evidence merely delineates a commercial backdrop for intelligent interpretation of the agreement. *Cf.* Hunt Foods & Industries, Inc. v. Doliner, 1966, 49 Misc.2d 246, 267 N.Y.S.2d 364, 368, rev'd on other grounds, 26 A.D.2d 41, 270 N.Y.S.2d 937. *See generally* Note, "The Law of Evidence in the Uniform Commercial Code," 1 Ga.L.Rev. 44, 74–75 (1966). Disclosure of a course of dealing or usage of trade does not delimit a particular party's intent, except insofar as it reveals that some ascribed intent might be ludicrous in the commercial world. Here Chase proffered testimony as to the duration of security for secured loans and as to its dealings with First Marion. Assuming for the moment that security interests are concomitant to subordination agreements under New York law and that a security interest survives until repayment of the debt, the parties' consolidated loan-standby-subordination agreement loses clarity. The dilemma as to duration becomes obvious: if the subordination and standby agreements were to terminate simultaneously, the Leitman note must have been due within eighteen months. However, if these agreements were not coterminous, the Leitman note need not have had such a limited duration.

■ Refusing to consider any extrinsic evidence, the trial judge perceived no ambiguity as to duration in the written agreement. On this appeal we need not consider the merits of his ultimate conclusion, since we reject the method used to reach that conclusion. Evidence of course of dealing and usage of trade was necessarily and properly admissible to explain, qualify, or supplement the provisions of this written agreement. In providing for the admission of such evidence, the Code manifests the law's recognition of the fact that perception is conditioned by environment: unless a judge considers a contract in the proper commercial setting, his view is apt to be distorted or myopic, increasing the probability of error. During the trial Chase undertook the task of furnishing its concept of the proper commercial environment. The District Judge erred in rejecting Chase's proffer to elucidate the parties' course of dealing and the relevant usage of trade.

This is not to imply that the quantum of proof produced by Chase would have necessitated a verdict in its favor. Nor does the preceding discussion mean that a durational dichotomy necessarily exists between the standby and the subordination agreements. In presenting its case, Chase improperly circumvented one of this controversy's most crucial issues, resolution of which must be antecedent to consideration of the duration problem. Chase has postulated an equation between subordination agreements and security interests. Utilizing this postu-

---

3.  The official comment discloses:

     [I]t is not required that a usage of trade be "ancient or immemorial", "universal" or the like. * * *

     \* \* \* \* \*

     Subsection (3), giving the prescribed effect to usages of which the parties "are or should be aware", reinforces the provision of subsection (2) requiring not universality but only the described "regularity of observance" of the practice or method. This subsection also reinforces the point of subsection (2) that such usages may be either general to trade or particular to a special branch of trade.

     *Id.* § 1–205, Official Comment, at 5, 7.

late, it has reasoned that termination of a subordination agreement prior to extinction of the debt allegedly secured by that agreement would be commercially unsound. According to Chase, no bank or commercial institution would propose or countenance such charity. Therefore, a discrepancy must have crept into the written agreement: the subordination and standby agreements cannot be coterminable.

█ Considered in the abstract, this argument seems valid. However, Chase has incorrectly postulated the premise for its contention—*i. e.*, security interests are necessarily concomitant to subordination agreements. New York law requires proof to substantiate this proposition. *See* N.Y. Uniform Commercial Code § 1–209 (McKinney Supp.1966).[4] Although Chase's witnesses have established the possibility that the subordination agreement was predicated on creation of a security interest, proving the reality of such an arrangement necessitates detailed explication. If, in light of banking practices in problem loan situations and Chase's dealings with First Marion, an unsecured loan to the Leitman Group would have seemed unreasonable, ambiguities arise within the subordination provision. For example, use of the term "trust" rather than "security" should be explained. Moreover, the meaning of the phrase "unless and until the indebtedness evidenced by the Chase Note shall have been fully paid" must be ascertained. *See generally* Calligar, "Subordination Agreements," 70 Yale L.J. 376 (1961); Coogan, Kripke, & Weiss, "The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements," 79 Harv.L.Rev. 229 (1965); Epstein, "Security Transfers by Secured Parties," 4 Ga.L.Rev. 527 (1970).

Until the trier of fact characterizes the subordination agreement executed by these parties, he cannot begin to answer the questions posed by the allegedly all-encompassing duration provision in the written agreement. Surely his answers to the duration questions must depend on his threshold interpretation of the subordination agreement: proof of a security interest is prerequisite to discovery of a discrepancy in the duration provision.

█ In summary, evidence of course of dealing and usage of trade is admissible to permit analysis of the written agreement in the proper commercial setting. Such evidence *might* disclose ambiguities within the provisions of the agreement and ostensible inconsistencies in their relationship to one another. Certainly, in the context of this case, Chase's proffered testimony and evidence as to course of dealing and usage of trade remain subject to cross-examination, as well as First Marion's contrary testimony and evidence regarding the same matters. Ultimately, having considered all relevant course of dealing and usage evidence, the District Judge must determine whether the written agreement contains ambiguities or lacks potentially material terms. Eskimo Pie Corp. v. Whitelawn Dairies, Inc., S.D. N.Y.1968, 284 F.Supp. 987, 993–995; *see* Farmer v. Arabian American Oil Co., 2 Cir. 1960, 277 F.2d 46, 49, cert. denied, 1960, 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed.2d 53; Dixon Iramaos & Cia. Ltda. v. Chase National Bank, 2 Cir. 1944, 144 F.2d 759,

---

4. Section 1–209 provides:

An obligation may be issued as subordinated to payment of another obligation of the person obligated, or a creditor may subordinate his right to payment of an obligation by agreement with either the person obligated or another creditor of the person obligated. Such a subordination does not create a security interest as against either the common debtor or a subordinated creditor. This section shall be construed as declaring the law as it existed prior to the enactment of this section and not as modifying it.

There is scant commentary regarding this section. Ostensibly it does not obviate proof of intention to create a concomitant security interest. 1 Uniform Laws Annotated: Uniform Commercial Code § 1–209, at 62–63 (West 1968).

762, cert. denied, 1944, 324 U.S. 850, 65 S.Ct. 687, 89 L.Ed. 1410.

## II.

■■ If the court—after consideration of all relevant course of dealing and usage of trade evidence—determines as a matter of law that the written agreement is unambiguous and integrated, evidence of the intentions and subsequent actions of the parties is irrelevant to the decision of this case. Viewed against the proper background, clear words and provisions leave no room for factual judgments. Bethlehem Steel Co. v. Turner Construction Co., 1957, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590, 593; Brainard v. New York Central Railroad Co., 1926, 242 N.Y. 125, 151 N.E. 152, 154; *accord*, Armour & Co. v. Celic, 2 Cir. 1961, 294 F.2d 432, 438; Kranze v. Cinecolor Corp., S.D.N.Y.1951, 96 F.Supp. 728, 729. However, if the District Judge rules that the agreement in question is ambiguous, incomplete, or uncertain in any respect, parol evidence of the intent and purposes of the parties in making the contract becomes admissible for construction. Webb & Sons, Inc. v. Hamilton, 1968, 30 A.D.2d 597, 290 N.Y.S.2d 122, 124; *see* Lemelson v. Ideal Toy Corp., 2 Cir. 1969, 408 F.2d 860, 864; Nathan v. Monthly Review Press, Inc., S.D.N.Y.1969, 309 F.Supp. 130, 134; Gillet v. Bank of America, 1899, 160 N.Y. 549, 55 N.E. 292, 294. In Thomas v. Scutt, 1891, 127 N.Y. 133, 27 N.E. 961, 962–964, the New York Court of Appeals listed the considerations pertinent to the admission of parol evidence in situations such as this. The court commented:

> The second class embraces those cases which recognize the written instrument as existing and valid, but regard it as incomplete, either obviously, or at least possibly, and admit parol evi-

dence, not to contradict or vary, but to complete * * *. [T]his class * * * leaves the written contract unchanged, but treats it as a part of an entire oral agreement, the remainder of which was not reduced to writing. Two things however, are essential to bring a case within this class: (1) The writing must not appear, upon inspection, to be a complete contract, embracing all the particulars necessary to make a perfect agreement, and designed to express the whole arrangement between the parties, for in such a case it is conclusively presumed to embrace the entire contract. (2) The parol evidence must be consistent with, and not contradictory of, the written instrument. * * *

* * * * * *

■ Evidence to explain ambiguity, establish a custom, or show the meaning of technical terms, and the like, is not regarded as an exception to the general rule, because it does not contradict or vary the written instrument, but simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing. It is received where doubt arises upon the face of the instrument as to its meaning, not to enable the court to hear what the parties said, but to enable it to understand what they wrote, as they understood it at the time. Such evidence is explanatory, and must be inconsistent [*sic*] with the terms of the contract.[5]

■ The object of rules of construction generally, and of parol evidence particularly, is to ascertain the intention of the parties. *See* William C. Atwater & Co. v. Panama Railroad Co., 1927, 246 N.Y. 519, 159 N.E. 418, 419; Gillet v.

---

5. Insofar as admitting evidence of course of dealing and usage of trade, the Uniform Commercial Code abrogates Thomas v. Scutt's requirement of a patent contractual ambiguity. Part I *supra*. Often the trial judge must move beyond the four corners of the document to determine whether it is ambiguous, or whether the parties contemplated a consistent additional term. *E. g.*, Ciunci v. Wella Corp., 1966, 26 A.D.2d 109, 271 N.Y.S.2d 317, 319. *See also* 9 J. Wigmore, Evidence, § 2430, at 97–102 (3d ed. 1940).

Bank of America, *supra*, 55 N.E. at 294. However, in New York contract law it is well established that in determining whether the parties had the necessary intention to contract, an objective test is generally applied: the manifestation of a party's intention rather than his actual subjective intent is ordinarily controlling. Mencher v. Weiss, 1953, 306 N.Y. 1, 114 N.E.2d 177, 181. "[T]he view of the New York courts has been that an objective standard is essential to maintain confidence in the written integrated agreement as the medium for conducting commercial relations." Eskimo Pie Corp. v. Whitelawn Dairies, Inc., *supra*, 284 F.Supp. at 994.

Thus parol evidence allegedly elucidating intent but contradicting the express terms of a written agreement is never admissible. Chase Manhattan Bank v. May, 3 Cir. 1962, 311 F.2d 117, 118–119, cert. denied, 1963, 372 U.S. 930, 83 S.Ct. 874, 9 L.Ed.2d 733; Thomas v. Scutt, *supra*, 27 N.E. at 963.[6] Application of this canon is especially appropriate when, as here, the complaining party has drafted the agreement in question. Rentways, Inc. v. O'Neill Milk & Cream Co., 1955, 308 N.Y. 342, 126 N.E.2d 271, 273.[7] Nevertheless, "in seeking for the intent of the parties as evidenced by the words used, the fact that a construction contended for would make the contract unreasonable, and place one of the parties at the mercy of the other, may properly be taken into consideration." Gillet v. Bank of America, *supra*, 55 N.E. at 295; William C. Atwater & Co. v. Panama Railroad Co., *supra*, 159 N.E. at 419; Fleischman v. Fergueson, 1918, 223 N.Y. 235, 119 N.E. 400, 402.

### III.

Having considered all relevant evidence and testimony, according to the guidelines discussed *supra*, the District Judge might ultimately dispose of this controversy in either of two ways suggested by the parties. He might conclude that the final written agreement mirrors, however abstrusely, the agreement between Chase and First Marion. He might then resolve any ambiguities in either party's favor. To justify either result, he must determine whether the subordination agreement carried a concomitant security interest and whether the subordination and standby agreements were intended to be coterminous.

Alternatively, the District Judge might conclude that the written agreement fails to reflect the real agreement between the parties. Thus reformation may be necessary. *See* Sweet, "Contract Making and Parol Evidence: Diagnosis and Treatment of a Sick Rule," 53 Cornell L.Rev. 1036, 1042 (1968). However, to establish its right to such relief, Chase must produce *"clear, positive and convincing evidence"* of a scrivener's error—*i. e.*, of a mistake in reducing the agreement to writing. Ross v. Food Specialties, Inc., 1959, 6 N.Y.2d 336, 189 N.Y.S.2d 857, 160 N.E.2d 618, 620; *accord*, Nash v. Kornblum, 1962, 12 N.Y.2d 42, 234 N.Y.S.2d 697, 186 N.E. 2d 551, 553–554. Reformation "is applicable where the parties have a real and existing agreement on particular terms and subsequently find themselves signatories to a writing which does not accurately reflect that agreement, as opposed to a situation where there is a mistake as to the agreement itself on the part

---

**6.** In this non-jury action, the District Judge correctly allowed Chase to proffer evidence before ruling as to admissibility. In a jury trial, the procedure is somewhat different, akin to a preliminary hearing. *E. g.*, Eskimo Pie Corp. v. Whitelawn Dairies, Inc., *supra*, 284 F.Supp. at 995.

**7.** *Rentways, Inc.*, is not dispositive of the present case. Chase does not question the intrinsic clarity of the language used in the duration provision. Rather, it chal-

lenges the provision's applicability to the subordination agreement in light of the language used in that agreement. The gravamen of Chase's argument is that an all-inclusive duration provision would vitiate the subordination agreement. In New York the interpretation which effectuates all terms of the agreement is favored. Rentways, Inc. v. O'Neill Milk & Cream Co., *supra*, 126 N.E.2d at 273; Fleischman v. Fergueson, 1918, 223 N.Y. 235, 119 N.E. 400, 401.

of one of the parties." Harris v. Uhlendorf, 1969, 24 N.Y.2d 463, 301 N.Y.S.2d 53, 248 N.E.2d 892, 894. *See also* 3 A. Corbin, Contracts § 614, at 723 (1960).

To reiterate, we do not prejudge the merits of the case *sub judice.* Indeed, since so few preliminary issues have been resolved, we cannot decide what disposition is necessary or proper here. We hold merely that the District Judge mistakenly rejected proffered evidence and testimony pertaining to course of dealing and usage of trade. Only then could he determine whether Chase's parol evidence explaining the alleged intent of the parties would be excludable. Thus omission of such significant material rendered his final judgment clearly erroneous. *See* Weissinger v. United States, 5 Cir. 1970, 423 F.2d 795, 798; Trask v. Susskind, 5 Cir. 1967, 376 F.2d 17, 19. Although Chase must surmount several imposing obstacles to achieve its goal, it must at least have the opportunity to make the attempt. Consequently we reverse the District Court's judgment of dismissal under Fed.R.Civ.P. 41(b) and remand for proceedings consistent with this opinion.

Reversed and remanded.