ELIZABETH FRICKE, RESPONDENT, v. HENRY BELZ, APPELLANT.—177 S. W. (2d) 702.

St. Louis Court of Appeals. Opinion filed February 8, 1944.

*Edward W. Tobin, George F. Heege* and *Edward A. Haid* for appellant.

*A. G. Jannopoulo* for respondent.

HUGHES, P. J.—The suit was prosecuted by respondent-plaintiff seeking to recover from appellant-defendant the principal and interest on a promissory note in words and figures as follows:

"$1000.00                                                    June 24th 1939

Eighteen months after date we promise to pay to the order of Fred H. Fricke

BELZ $1000 and 00 cts Dollars

Payable at St. Louis, Missouri

For value received negotiable and payable without defalcation or discount and with interest from 6/24/39 at the rate of 6 per cent per annum.

No 1    Due 12/24/40

J. H. BELZ PROVISION COMPANY
HENRY BELZ."

The words "BELZ $1000 and 00 cts Dollars" are impressed on the note by means of a protectograph machine used in the office of J. H. Belz Provision Company. The words or signature "J. H. BELZ PROVISION COMPANY", at the bottom of the note is typewritten in capital letters. The inscription or signature "HENRY BELZ" is in

the hand writing of Henry Belz, who was President of the J. H. Belz Provision Company.

The petition is in conventional form. The answer is in substance that the note was intended to be and was in fact the obligation of J. H. Belz Provision Company; that the defendant intended to sign the same as President of the J. H. Belz Provision Company and not as a co-maker; that the payee of said note so understood; that plaintiff is not a holder in due course of said note, but acquired the same with full knowledge of the facts and circumstances surrounding the execution thereof and therefore prayed that said note be reformed so as to comport with the real intention of, the parties, and for other proper relief. The reply is a general denial, followed by a statement that plaintiff is a *bona-fide* holder in due course of the note, and a plea of laches and estoppel is invoked. It will thus be seen that the answer prays for equitable relief; this appears to us to have been unnecessary. Where a mistake in the written instrument sued on is set up as a defense and the reformation of the instrument is not necessary in order to place the defendant *in statut quo* or to give back some title or position surrendered by him, full relief may be had without resorting to equity. [Short v. Thomas, 178 Mo. App. 400, l. c. 417, 163 S. W. 252; McNeill v. Wabash R. Co., 207 Mo. App. 161, l. c. 172, 231 S. W. 649; Buhler Mill & Elevator Co. v. Jolly, 217 Mo. App. 240, l. c. 245, 261 S. W. 353.] Nevertheless the answer did ask for affirmative relief in equity, and both sides tried the case as one in equity, and we are therefore authorized in so treating it, and disposing of the case on appeal on the same theory on which it was presented in the trial court. The only difference it makes is, that treating the case as one in equity, it becomes our duty to review the evidence and make such findings from the facts as we deem proper.

There is little dispute about the actual execution of the note. Fred H. Fricke, plaintiff's husband, had been in the employ of the J. H. Belz Provision Company for a number of years, and owned a small number of shares of its capital stock. In June, 1939, the J. H. Belz Provision Company was in financial difficulties, and was without operating funds to continue its business. An effort was made to borrow money through the Governmental agency known as the R. F. C., but the application was denied. Thereafter the J. H. Belz Provision Company made application to and were promised a loan through a company in Chicago. In the meantime and while the loan was being negotiated it was found that the J. H. Belz Provision Company required approximately $15,000 to carry on its business. The President of the Company, Henry Belz, called a meeting of the officers and employees, and the situation was discussed, and it was agreed that several of the officers and employees would loan to the Company varying sums of money aggregating $15,400. Fred H. Fricke's subscription of $1000

to the loan was paid by two cashier's checks, one for $600 and one for $400. Others paid their subscription by check or cash. Before the fund thus raised was deposited to the credit of J. H. Belz Provision Company, the Chicago Company was contacted by telephone in order to ascertain whether its loan to the J. H. Belz Provision Company would go through, and being assured that it would, the $15,400 was deposited in the bank to the credit of J. H. Belz Provision Company, and Miss Long (now Mrs. F. B. Simner) who was secretary to Henry Belz, at the direction of Ralph Von Brunn who was secretary of the J. H. Belz Provision Company, prepared not only the note in suit but similar notes except as to amount to be signed and delivered to the several employees. On each note Miss Long typed at the bottom the signature or words, "J. H. BELZ PROVISION COMPANY". The note in suit is exactly as it was prepared by Miss Long except that the signa- tures or inscription "Henry Belz" was thereafter affixed.

The contemplated loan to the J. H. Belz Provision Company through the Chicago company did not go through and was not made, and on July 3, 1939, the J. H. Belz Provision Company, being unable to continue in business, went into voluntary bankruptcy.

The testimony of plaintiff as to how she acquired the note is as fol- lows: She and Fred H. Fricke were married about thirty-six years before the date of the trial; before her marriage she had lived with her parents and for three or four years worked at the Grand-Leader at a salary of from $5.00 to $7.00 per week, and from her salary and money her parents had given her for Christmas and birthday presents she had saved $800; after her marriage she kept this money in their home in an iron box for about three years, when her husband's father gave them an iron safe; thereafter she kept the money in their home in the iron safe; she had never loaned any of it and never told anyone during all that time that she had it. She further said that when the J. H. Belz Provision Company closed its doors on July 3, 1939, her hus- band was thrown out of employment and started a business of his own; that about two weeks thereafter her husband remarked that he didn't have any money and didn't know how he would pay his bills to run his business, that he had given Henry Belz all he had; and that is when she gave him the $800; that two weeks later she said to her husband, "How in the world are you going to give me that money back I gave you, that eight hundred?", and her husband said nothing but just went and got the note and gave it to her and then said, "Here, this is what I will give you for that eight hundred you gave me".

Plaintiff further testified as follows:

"Q. What did you say to him when you gave him the $800? A. Well I gave it to him with the intention that he was using it a good way in his business and making a living.

"Q. You gave it to him so he could use it in his business A. Yes, sir; I did.

"Q. In order to make a living? A. Yes, sir.

"Q. Did you ask him at that time when he was going to pay it back? A. No, not at that time I didn't.

. . . . . . . . .

"Q. You asked: "How in the world are you ever going to give me that money back I gave you, that eight hundred?" A. Yes.

"Q. And without saying anything he went and got this note and gave it to you? A. Yes, sir.

"Q. Where did he get the note? A. I don't know that.

"Q. You didn't know where he kept it? A. No, I didn't.

"Q. You didn't know he had got that note? A. No, sir."

Plaintiff testified as to her husband's endorsement on the back of the note as follows:

"Q. Who is Fred H. Fricke? A. My husband.

"Q. What do you see, if anything, on the back of that note? A. Well, that is his writing.

"Q. What is it on there? A. Fred H. Fricke.

"Q. You see the name? Do you know your husband's hand writing? A. Oh, yes, I do.

"Q. Is that it? A. Yes, sir.

"Q. Did he hand you the note? A. Yes, sir."

And on cross-examination the following:

"Q. Now, when your husband gave you that note did you see him sign his signature on the back of the note? A. No, sir, I did not.

Fred H. Fricke, plaintiff's husband, although present in the court room during the trial, was not called as a witness.

The note became due on December 24, 1940, and plaintiff said nothing to her husband about it, and said nothing to Henry Belz about it, but in February or March, 1942, over two years later, she placed it in the hands of an attorney for collection.

The first and most important question in this case, and one which if answered in the affirmative, is dispositive of the case, is, whether or not there is an ambiguity apparent on the face of the note sued on. That is, is there indistinctness or uncertainty of meaning as to who was the actual maker of the note, and does such indistinctness or uncertainty appear on the face of the note.

The law is well settled that where a corporate name appears as maker of a note, and there is added below such corporate name another signature followed by such designation as, "Sec'y, Pres., or Agent", that such designation is a disclaimer of personal responsibility. Such is the case of Myers v. Chesley, 190 Mo. App. 371, 177 S. W. 326, where the note was signed:

"Blue Bell Mining Company
Frank Chesley, Pres.
Vera E. Whitten, Sec'y".

In the case of Reifeiss v. Barnes (Mo. App.), 166 S. W. (2d) 225, this court held that a note signed "Metalcraft Corporation", immediately beneath which name there appeared the signature "B. M. Barnes, Sec'y", on its face showed that B. M. Barnes signed it in his official capacity, and did not create any personal responsibility on his part, and that there was no ambiguity. On the note in suit there appear two names without any additional word to the second signature to indicate in what capacity it was signed. One may sign a note in different capacities; he may sign as a co-maker, as a surety, as an authorized agent, or as an attesting witness to another signature. If the note on its face clearly shows in what capacity it was signed, then there is no ambiguity which is subject to explanation by parol evidence. If this note had not contained the signature "J. H. Belz Provision Company" but only the signature "Henry Belz" then under all the authorities Belz would not be permitted to offer parol evidence that he had signed it in any other capacity than as an individual, and this for the reason that in such case there would be no ambiguity. But an inspection of this note would at once arouse in the mind of anyone the question of whether Henry Belz signed as a co-maker, or whether he signed in attestation of the signature, "J. H. Belz Provision Company".

It is provided in the Negotiable Instrument Act, by Section 3036, as follows:

"Where the instrument contains or a person adds to his signature words indicating that he signs for or on behalf of a principal or in a representative capacity, he is not liable on the instrument if he was duly authorized.; but the mere addition of words describing him as agent, or as filling a representative character, without disclosing his principal, does not exempt him from personal liability."

With reference to this section it is said in 10 C. J. S., sec. 32, p. 445, as follows:

"This statute abrogates existing common-law or statutory rules which are not in conformity with it. Its effect has been said to sweep subtleties away and to relief the maker of personal liability whenever the form of the paper is such as fairly to indicate to the eye of common sense that the maker signs as agent or in a representative capacity, any phraseology which so indicates to the ordinary mind being sufficient for this purpose."

This note did contain as a party maker the name "J. H. Belz Provision Company," which, although not conclusively showing, certainly did indicate, that Henry Belz had signed for or on behalf of the "J.H. Belz Provision Company". From a mere inspection there would arise in the mind of any reasonable and prudent person, and especially a purchaser for value of the instrument, the question of who was the maker or makers of the note. We find no case in Missouri where the exact situation is presented as here. The nearest approach

is the excerpt from the case of Bank of Alexandria v. Bank, 5 Wheaton 377, as stated in the case of Sparks v. The Dispatch Transfer Co., 104 Mo. 531, 544, 15 S. W. 417, 420, to the effect that the appearance of the corporate name on the face of the paper at once leads to the belief that it is a corporate, and not an individual transaction. However, from the reasoning contained in the case of Myers v. Chesley, *supra*, and Reifeiss v. Barnes, *supra*, as well as all the cases cited by counsel we think the correct and reasonable rule is that if there exists on the face of the note circumstances from which it might reasonably be inferred that the signature was either on behalf of the corporation, or was as co-maker, extrinsic evidence may be adduced to remove the doubt.

The question was before the Supreme Court of New York in the case of Dunbar Box & Lumber Co. v. Martin, 103 N. Y. Supp. 91, where at the place for signature there was stamped the name, ''Varick Contracting Company'', and immediately beneath there was inscribed the name ''John L. Martin''. The suit was being prosecuted against the executrix of John L. Martin. The Supreme Court had this to say:

''The defendant further claims that the note is ambiguous on its face; that, although Martin's name is signed to the note, the stamp of the Varick Contracting Company is also there, and Martin's name is inserted in the space evidently intended to hold an officer's signature. The note also reads, ''We promise to pay,'' etc., and this would indicate that it was not the promise of a single individual. Moreover, it appears from the testimony of Mr. Reid, the president of the plaintiff, that he received the note from Martin and saw him sign it, and that his company had no account with Martin personally, but only with the Varick Contracting Company, of which Martin was president.

''Under these conditions we think the note was ambiguous, and that it does not appear absolutely to be the personal note of defendant's testator. It follows, therefore, that evidence showing that the note was the company's note, and accepted as such by the plaintiff, would be proper.''

Holding as we do that the note in suit, on its face, presented an ambiguity which was subject to explanation by parol evidence, and that such evidence was adduced, what do we find? All of the evidence without contradiction or question was that Fred H. Fricke and other employees loaned to the J. H. Belz Provision Company $15,400, and that Henry Belz never received personally a cent of the money; that the note to Fred H. Fricke for $1000, as well as each of the notes of the other employees, were prepared by the secretary of the Company's president, under the direction of the Company's secretary, and by error and mistake of the scrivener as well as of the parties the name Henry Belz appears on the note without designation of his re-

lation to the debtor, the J. H. Belz Provision Company but that the note represents the debt of the J. H. Belz Provision Company.

And holding as we do, that there was an ambiguity apparent on the face of the note, it follows that plaintiff is not an innocent purchaser for value. She could see what any one else could see, that there was an apparent ambiguity as to the signatures on the note, and it was her duty to inquire, if in fact she was a purchaser for value. It was a maxim of the common law that "He who considers merely the letter of an instrument goes but skin deep into its meaning." She was placed upon inquiry but failed to inquire.

Looking at the case from another viewpoint, we do not think plaintiff's evidence sufficient to establish that she was a *bona-fide* holder in due course of the note. The story she tells of where she got the $800 she gave to her husband, and for which he later gave her the note, is a most unlikely though possible one. It is difficult to conceive of this housewife keeping $800 in currency about her home for something like thirty-four years without anyone knowing anything about it. But she says she did, and there is no way the defendant could affirmatively disprove it. Assuming that she had the money and did turn it over to her husband, she certainly did not by that transaction create the relation of debtor and creditor between herself and her husband; she repeatedly says she "gave" it to him, and then explains that she "gave" it to him in order for him to make a living. Not a word was said to indicate that it was a loan or that she expected it to be repaid. Then some two weeks later, she says, "Well, I was just kind of wondering how he was making out with his business on the eight hundred I gave him; I wanted to see what he would say?", and she then asked him, "How in the world are you ever going to give me that money back I gave you, that eight hundred?", and without saying anything he went and got the note and gave it to her. Of course, the relation of debtor and creditor may be established between a husband and wife, or they may contract with each other, or buy and sell to each other, but where a third party's interests are involved in a transaction between husband and wife, as stated by our Supreme Court in the case of East St. Louis I. & C. S. Co. v. Kuhlmann, 238 Mo. 697, 142 S. W. 253, 256, "The wise rule in equity is that since the intimate relation of husband and wife affords a convenient and often-used opportunity and vehicle for fraud on creditors, transactions between husband and wife in property matters are to be scanned with a jealous and discriminating eye by a chancellor when questioned by creditors and the very marrow of the matter is to be searched to discover the true intendment of the thing to the end that it may be held good or bad as just equitable considerations point."

And when we read the plaintiff's testimony, with her often repeated statements of having *given* the $800 to her husband, and two weeks later his having *given* her the note, the transaction has none of the

indicia of a *bona-fide* transaction of purchase, or of a debt having been created on the husband's part and being repaid. And then,when we further consider that she kept the note for over two years after it was due according to its face, and said not a word to her husband about it, and said not a word to Henry Belz about it; and then when we read from the evidence that her husband was by her side in the court room when her good faith in acquiring the note was being questioned, and she did not call upon him as a witness, we are led to the conclusion that the transfer of this note to the wife was not in good faith. Fred H. Fricke was the only witness who could explain the whole transaction and this was being tried as an equity case, and it was the duty of both sides to present all of the facts to the chancellor. Of course the defendant could have called Fred H. Fricke as a witness, but he would hardly be expected to do so, and thus vouch for his credibility when the very nature of defense was that the transfer of the note was not in good faith.

And furthermore, under the peculiar circumstances attending the whole transaction as between plaintiff and her husband; we should scrutinize with more than ordinary care the actual transfer of the note to the wife, and whether a *prima-facie* case was proved, and so doing we have only her word on the subject, and she does not say that her husband's endorsement was on the back of the note when she received it. In order to establish a *prima-facie* case it devolved on her to show not only that the endorsement was genuine but that it was on the back of the note when she took it.

Respondent contends that the court will not reform the note because the original payee Fred H. Fricke is not a party to the suit. It is well settled that in a proper case reformation can be had against subsequent purchasers who are charged with notice. [Hoxsey Hotel Co. v. Farm & Home Savings & Loan Ass'n of Missouri, 349 Mo. 880, 163 S. W. (2d) 766.]

Respondent argues that there was no showing that Henry Belz as president had authority to borrow money from or execute the note to Fred H. Fricke on behalf of the corporation. This contention is inconsistent with the pleadings and the theory on which the case was being prosecuted. There was no plea of *ultra vires*, or that J. H. Belz Provision Company was not a maker of the note. Henry Belz was sued and the case tried on the theory that he signed the note without any words to indicate he was signing for the corporation, and that this made him personally liable as a maker. Plaintiff cannot in one breath repudiate the validity of the note sued on because given without authority, and in the next breath proceed on the theory that it is a valid note and Henry Belz is a *bona-fide* party to it. Not only so, but there is no evidence that the board of directors did not authorize the loan from the employees. The evidence was that whatever if any minutes were kept of the proceedings of the directors were lost or

misplaced in the course of the bankruptcy proceeding. In any event if plaintiff had been relying upon the liability of Henry Belz because he had executed a corporate note without authority of the corporation and was consequently personally liable, the petition or at least the reply should have been so framed. The plea or defense of *ultra vires* as to acts of a corporation is affirmative and special, and must be specially pleaded in order to be available, and cannot be raised by general denial. [Von Schleinitz v. North Hotel Co., 323 Mo. 1110, 23 S. W. (2d) 64, 79-80.] In the Von Schleinitz case it was further said:

"Furthermore, there are respectable judicial authorities to the effect that a creditor of a corporation, such as plaintiff herein, will not be permitted to question or attack a corporate transaction merely on the ground that such transaction is *ultra vires* the corporation, unless such creditor specially and affirmatively pleads and proves that the *ultra vires* transaction was fraudulently conceived and accomplished for the purpose of avoiding and defeating the corporate debt owing to the creditor, the plea or defense of *ultra vires* being usually restricted and available only to the corporation itself, or to its stockholders, or, in a proper case, to the state or sovereignty from which it obtained its charter and corporate existence."

Respondent pleads laches and estoppel, which are closely akin in their nature. We find no basis for either. Laches is available only where equitable relief is sought, and plaintiff is not seeking equitable relief in this action. An estoppel *in pais* is a right arising from acts, admissions, or conduct which have induced a change of position of the party relying thereon. No such conditions prevail in this case.

We think the judgment should be reversed and the cause remanded with directions that a judgment and decree be entered ordering the note herein sued on be reformed in accordance with defendant's answer by inserting before the signature "Henry Belz" the word "By", and immediately after said signature the word "President", and a judgment and finding for defendant. It is so ordered. *McCullen* and *Anderson, JJ.*, concur.