# SOUTHERN CONCRETE SERVICES, INC.

### v.

## MABLETON CONTRACTORS, INC., d/b/a Mableton Drilling Co.

### Civ. A. No. C74–1299A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 5, 1975.

582

Thomas C. Shelton and Joseph W. Dorn of Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

Mose S. Hayes, Jr., of Hayes, Hayes & Gaskill, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, Chief Judge.

This is a diversity action in which plaintiff seller seeks to recover lost profits and out-of-pocket expenses from defendant buyer for buyer's alleged breach of contract. The case is currently before the court on plaintiff's motion for a ruling on the admissibility of certain evidence.

In September 1972 the parties entered into a contract for the sale of concrete for use in the construction of the building foundation of a power plant near Carrollton, Georgia. The contract stipulated that plaintiff was to supply "approximately 70,000 cubic yards" of concrete from September 1, 1972 to June 15, 1973. The price to be paid for such concrete was $19.60 per cubic yard. The contract further stipulated that "No conditions which are not incorporated in this contract will be recognized." During the time period involved defendant ordered only 12,542 cubic yards of concrete, that being the total amount needed by the defendant for its construction work. The plaintiff has brought this action to recover the profits lost by defendant's alleged breach and the costs plaintiff incurred in purchasing and delivering over $20,000 in raw materials to the jobsite.

The defendant claims that the written contract must be interpreted both in light of the custom of the trade and in light of additional terms allegedly intended by the parties. Defendant contends that under such custom and additional terms, it was understood that the quantity stipulated in the contract was not mandatory upon either of the parties and that both quantity and price were understood to be subject to renegotiation. It is this evidence of custom in the trade and of additional conditions allegedly agreed to by the parties that defendant seeks to introduce at trial.

In support of its position, defendant relies upon Georgia Code Ann. § 109A–2–202 (U.C.C. § 2–202) which provides that a written contract may be explained or supplemented "by a course of dealing or usage of trade" and by evidence of "consistent additional terms."[1] This section was meant to liberalize the common law parol evidence

---

1. "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (109A–1–205) or by course of performance (109A–2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

Georgia Code Ann. § 109A–1–205, in turn, reads: " * * *

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court."

rule to allow evidence of agreements outside the contract, without a prerequisite finding that the contract was ambiguous. In addition, the section requires contracts to be interpreted in light of the commercial context in which they were written and not by the rules of legal construction. *See* Draftsmen's Comment to U.C.C. § 2–202, *Warren's Kiddie Shoppe, Inc. v. Casual Slacks, Inc.*, 120 Ga.App. 578, 171 S.E.2d 643 (1969).

The question then becomes what is meant by the term "explained or supplemented"; does defendant's evidence "explain" the contract or does it attempt to "contradict" it? The court will examine this question with regard to the trade usage issue first, and then deal with the "additional terms" question.

### I.

In the official comment to U.C.C. § 2–202, the draftsmen emphasize that contracts are to be interpreted with the assumption that the usages of trade "were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used," Comment No. 2. In *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4th Cir. 1971), the court was faced with a contract similar to the one in the instant case. The contract provided for the sale of at least 31,000 tons of phosphate each year for three years at a stated price, subject to an escalation clause dependent on production costs. The buyer bought less than one-tenth the minimum amount contracted for in the first year and the seller brought suit. The defendant offered to introduce evidence showing that contracts of the type involved were meant to be mere projections of price and quantity due to the rapid fluctuation in demand in the fertilizer industry. The defendant buyer also sought to introduce evidence of prior dealings between the parties in which the plaintiff, as *buyer*, often failed to purchase the entire amount contracted for from defendant. Since the contract was silent on the subject of adjusting prices and quantities to reflect a declining market, and since it did "not expressly state that course of dealing and usage of trade cannot be used to explain or supplement the written contract", the court allowed the evidence to be admitted. 451 F.2d at 9, 10.

There are, however, certain important differences between *Royster* and the case at hand. In *Royster*, the court noted that the contract default clause dealt only with the buyer's failure to pay for *delivered* phosphate, thus raising the possibility that the contract was not meant to require the buyer to accept the entire contract amount. In addition, the court was faced with a situation where the equities were strongly in favor of the defendant. In previous dealings between the parties, the defendant had apparently never insisted on purchase of the entire contract amount by plaintiff. Now that plaintiff was the seller it was insisting on strict compliance with the literal terms of the contract. The plaintiff also enjoyed the protection of an escalation clause in the contract which allowed it to raise prices to compensate for increased production costs, while plaintiff refused to allow the defendant to renegotiate for a lower price to reflect market conditions. Thus the court in *Royster* faced a situation in which one party may have been trying to take unfair advantage of a long-standing customer.

Such a situation is not present in this case, however, and this court has grave doubts about applying the reasoning of *Royster* to different fact situations. Here, no prior dealings are alleged by either party; the contract by its terms does not intimate that the buyer would only be liable for concrete actually delivered, and the contract does not contain provisions granting one party special repricing rights. Instead, the contract sets out fairly specific quantity,

price, and time specifications.[2] To allow such specific contracts to be challenged by extrinsic evidence might jeopardize the certainty of the contractual duties which parties have a right to rely on. Certainly customs of the trade should be relevant to the interpretation of certain terms of a contract, see *Warren's Kiddie Shoppe, supra,* and should be considered in determining what variation in specifications is considered acceptable, *see Modine Manufacturing Co. v. Northeast Ind. School District,* 503 S.W.2d 833 (Texas Ct. of Civ.App.1973) (where the court allowed a 6% deviation in cooling capacity of an air-conditioning system since such deviation was acceptable in the trade), but this court does not believe that section 2–202 was meant to invite a frontal assault on the essential terms of a clear and explicit contract.

The type of evidence which the *Royster* decision might allow and which the defendant here undoubtedly wishes to introduce would probably show that very few contracts specifying quantity and price in a particular industry have been strictly enforced. (*See, e. g., Royster, supra,* at 7–8, n. 3.) While in some industries it may be virtually impossible to predict future needs under a contract, in other industries, such contracts may not be strictly adhered to for entirely different reasons. Lawsuits are costly and they do not facilitate good business relations with customers. A party to a contract may very much prefer to work out a renegotiation of a contract rather than rest on its strict legal rights. Yet, the supplier or purchaser knows that he may resort to those enforceable contract rights if necessary. If the courts were to conclude that this reluctance to enforce legal rights resulted in an industry-wide waiver of such rights, then contracts would lose their utility as a means of assigning the risks of the market. The defendant here may be correct in its assertion that contracts for the sale of

concrete are often subject to renegotiation, but that fact alone does not convince the court that the parties here did not contemplate placing on the buyer the risk of variation in quantity needs.

The court recognizes that all ambiguity as to the applicability of trade usage could be eliminated by a blanket condition that the express terms of the contract are in no way to be modified by custom, usage, or prior dealings. Indeed, the *Royster* court found the absence of such a clause to be a determinative factor in allowing in extrinsic evidence. This court, however, is reluctant to encourage the use of yet another standard boilerplate provision in commercial contracts. If such a clause is necessary to preserve the very essence of a contract, then the purposes of the Code will be quickly frustrated. Consideration of commercial custom is an important aid in the interpretation of the terms of a contract, but parties will have no choice but to foreclose the use of such an aid if the inevitable result of such consideration is to have explicit contracts negated by an evidentiary free-for-all.

■ Although the official comments suggest that parties which do not want trade usage to apply should so stipulate in the contract (Comment 2 to § 2–202), that provision could not have been meant to allow the full-scale attack on the contract suggested here. The more reasonable approach is to assume that specifications as to quantity and price are intended to be observed by the parties and that the unilateral right to make a major departure from such specifications must be expressly agreed to in the written contract. That way, the courts will still be free to apply custom and trade usage in interpreting terms of the contract without raising apprehension in the commercial world as to the continued reliability of those contracts. Such an approach is consistent with the

---

2. The court is not concerned about the use of the term "approximately 70,000 cubic yards". Obviously the parties anticipated some slight variation in the final amount, but defendant cannot claim that by use of the term "approximately" the parties contemplated acceptance of only 12,000 cubic yards.

underlying purposes of the Uniform Commercial Code, which dictates that the express terms of a contract and trade usage shall be construed as consistent with each other only when such construction is reasonable.[3] A construction which negates the express terms of the contract by allowing unilateral abandonment of its specifications is patently unreasonable.

## II.

■ The defendant also claims that section 2–202 allows the introduction of evidence of additional terms of the agreement between the parties. Those terms presumably called for price renegotiation and contained an understanding that the quantity quoted in the contract was intended only as an estimate. The court suspects, however, that the defendant is attempting to use section 2–202(b) as merely an alternative vehicle to get in evidence as to trade usage. The defendant does not specify in its brief the terms of the alleged extrinsic agreement and does not indicate whether it was oral or written, prior or contemporaneous. Rather, the defendant merely tags its 202(b) request on its trade usage claim as an apparent afterthought. But even if this court assumes that defendant will attempt to show additional terms of the contract, such evidence would be inadmissible. Section 2–202[4] requires that written contracts "not be contradicted" by evidence of agreements outside of the written contract, but that they may be explained or supplemented by evidence of "consistent additional terms" if the court finds the contract was not meant to be the complete statement of the agreement.

Whether or not the contract in issue was meant to be complete in itself, it is clear that the additional terms sought to be proved are not consistent with it. The type of evidence which may be admitted under subsection (b) deals with agreements covering matters not dealt with in the written contract. *See, e. g., Flamm v. Scherer,* 40 Mich.App. 1, 198 N.W.2d 702 (1972), *Pacific Indemnity v. McDermott Bros. Co.,* 336 F.Supp. 963 (M.D.Pa.1971), and *MacGregor v. McReki,* 30 Colo.App. 196, 494 P.2d 1297 (1971). To admit evidence of an agreement which would *contradict* the express terms of the contract would clearly eviscerate the purpose of § 2–202, *Bunge Corp. v. Recker,* 519 F.2d 449 (8th Cir. 1975), *see also* Comment 3 to § 2–202.[5]

The court is aware that at least one court has favored a broader construction of § 2–202, holding that evidence of a contemporaneous oral agreement to provide *up to* 500 tons of steel was consistent with a written provision in the contract stipulating delivery of 500 tons. *Schiavone & Sons, Inc. v. Securally Co., Inc.,* 312 F.Supp. 801 (D.Conn.1970). That court explained:

In making this determination, it must be borne in mind that to be inconsistent the terms must contradict or negate a term of the written agreement; and a term which has a lesser effect is deemed to be a consistent term." 312 F.Supp. 804.

This court respectfully disagrees with the above reasoning; for the buyer who wished to obtain all 500 tons, and who had to cover his requirements elsewhere, the term "up to 500" tons was clearly inconsistent with the contract. Similarly, a hypothetical agreement between

---

3. Georgia Code Ann. § 109A–1–205(4) provides: "The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

4. *See* note 1, *supra.*

5. Comment 3 provides in part: "If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."

the instant parties that quantity and price terms were to be mere estimates is inconsistent with the written contract.

Finally, the contract at issue specified that conditions not incorporated in the contract would not be recognized. In contrast, in *Schiavone, supra,* the court noted the absence of such a clause in finding the parol evidence admissible. The presence of such a clause here further convinces the court that the writing was intended to be the "complete and exclusive statement" of the terms of the agreement, Ga.Code Ann. § 109A–2–202(b).

The court therefore concludes that the evidence sought to be introduced by the defendant is inadmissible at trial.