CARTER BARON DRILLING, a Canadian partnership, Plaintiff,

v.

BADGER OIL CORPORATION, a Louisiana corporation, Defendant and Third-Party Plaintiff,

v.

EXCEL ENERGY CORPORATION, a Utah corporation, et al., Third-Party Defendants.

Civ. A. No. 82–K–2232.

United States District Court, D. Colorado.

March 5, 1984.

John V. McDermott, Ireland, Stapleton & Pryor, P.C., Denver, Colo., for plaintiff Carter Baron Drilling.

Phillip D. Barber, Welborn, Dufford & Brown, Denver, Colo., for Badger Oil Corp.

Donald C. McKinley, Thomas P. Johnson, Mayer, Brown & Platt, Denver, Colo., for all third-party defendants except Knee Hill Energy, Inc.

James T. Ayers, Jr., Clanahan, Tanner, Downing & Knowlton, Denver Colo., for Knee Hill Energy, Ltd.

## ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT

KANE, District Judge.

Plaintiff, Carter Baron Drilling, brought this action for breach of contract against the defendant, Badger Oil Company. The contract was executed on a standardized International Association of Drilling Contractors form on June 24, 1981. Carter Baron was styled the "contractor" and Badger Oil was styled the "operator." The contract obligated Carter Baron "to furnish the equipment and labor to drill (a well for Badger Oil)[1] in search of oil or gas on a daywork basis." In return, Paragraph 4 provided that "Operator shall pay contractor" specified amounts for mobilization, for demobilization, for moving the rig, plus a payment for each day's operations.

1. The Chrisman No. 1 Well.

At the time the contract was signed, Badger allegedly explained to Carter Baron that the working interest in the well was owned by Knee Hill Energy, Inc., and that as Knee Hill had no staff to operate the well, it had retained Badger to operate it on behalf of Knee Hill. Andersen Deposition at 28; Roemer Deposition at 19.

Drilling commenced in August 1981. In September of that year Badger allegedly first experienced difficulty in collecting money from Knee Hill. It informed Carter Baron that this was the reason why payments for the drilling work were in arrears. Carter Baron allegedly discussed the matter directly with Knee Hill. Hilliard Affidavit ¶ 5c. This state of affairs continued until January 1982 when Badger resigned as operator because of continued difficulty in obtaining money from Knee Hill. Badger alleges both that Carter Baron repeatedly told Badger that it would seek payment for its expenses from Knee Hill and that it never sought to collect from Badger.

In January 1982 Badger resigned as operator. Carter Baron sent no further invoices to Badger, but instead dealt directly with Knee Hill. McAdam Deposition at 74; Hilliard Affidavit ¶ 6g. Following Badger's resignation as operator, Carter Baron was paid no money by Badger but was paid approximately $950,000 on its account on the Chrisman No. 1 well by Knee Hill and the other working interest owners. McAdam Deposition at 67.

On July 22, 1982, Carter Baron demanded payment from Badger. When Badger refused to pay, this suit was initiated. The plaintiff, Carter Baron, now moves for summary judgment on the issue of Badger's liability for breach of contract. The main thrust of this motion is that the clause of the contract that reads "operator shall pay to the contractor" is unambiguous. The defendant's position is that as it was acting solely as Knee Hill's agent, it was under no duty to pay Carter Baron if Knee Hill did not provide it with funds. The defendant wants to introduce extrinsic evidence to prove this.

The intent of the parties to a contract is determined primarily from the language of the instrument itself. Extrinsic evidence is only admissible to prove intent when there is an ambiguity in the terms of the contract. *Radiology Prof. Corp. v. Trinidad Area Health*, 195 Colo. 253, 577 P.2d 748 (1978); *McNichols v. City and County of Denver*, 120 Colo. 380, 209 P.2d 910 (1949). Written contracts that are free from ambiguity are enforced because they express the intention of the parties. *American Mining Co. v. Himrod-Kimball Mines Co.*, 124 Colo. 186, 235 P.2d 804 (1951).

I find no ambiguity in the phrase "operator shall pay contractor" since the identity of the operator and the contractor is established in an earlier paragraph of the contract. Badger, however, contends that the *function* of an operator is open to debate. This is irrelevant because the issue is who is liable to pay for work performed. This is a question of identity, and function is only relevant if identity is in doubt. The cases cited by Badger do not aid its position. In *McNichols v. City and County of Denver*, 120 Colo. 380, 209 P.2d 910 (1949) the issue arose of whether funds originating from a sale of bonds authorized for "improving, extending and equipping the Denver General Hospital" could be used for a building for the Bureau of Public Welfare. The Colorado Supreme Court held that the word "hospital" had a clear meaning that did not encompass public welfare services. Therefore the use of the funds for such services was improper. By looking at the function of a hospital the court was able to determine the identity of the proper recipient of the funds. The word "operator" does not have as clear a meaning as the word "hospital," but the identity of the operator in this case is incontrovertible and so a determination of his function is not as relevant as in the *McNichols* case.

The case of *American Mining Co. v. Himrod-Kimball Mines Co.*, 124 Colo. 186, 235 P.2d 804 (1951) also fails to support Badger's position. That case involved the interpretation of a contract to grant a

lease. The Colorado Supreme Court approved the admission of parol evidence because the contract relied on was not final or complete. Significantly, the contract did not contain the names of all parties, 235 P.2d at 807, whereas the contract in this case names the parties. Badger also cites *Fink v. Montgomery Elevator Co.*, 161 Colo. 342, 421 P.2d 735 (1966) in support of its position. The court in *Fink* stated that:

> The law is that any ambiguity in an instrument whereby it is sought to hold a purported agent personally liable, can be explained by parol evidence. In such a situation the court will take the entire contract into consideration, not the signature alone. *See Fricke v. Belz*, 237 Mo. App. 861, 177 S.W.2d 702 (1944) (other citations omitted).

The ambiguity in that case arose from the fact that the names of both the purported principal and the agent appeared in the contract. The *Fricke* case, cited in the *Fink* case, emphasized that if only one signature appeared on the contract, there would be no ambiguity as to who was responsible. 177 S.W.2d at 706. In this case only the Badger Oil Co., through its Vice-President, Lamar Roemer, signed the contract.

A more difficult question is whether the alleged acts and statements of the parties during the life of the contract, and the usage of the trade, qualified the express payment term "operator shall pay to contractor." I must first consider whether evidence of these extrinsic elements is admissible at all.

■ Before the adoption of the Uniform Commercial Code in Colorado[2] the Colorado courts took the position that evidence of custom and usage was not admissible to vary the terms of an unambiguous contract. *See, e.g., Burt v. Craig*, 146 Colo. 173, 177–78, 360 P.2d 976–79 (1961); *Zimbelman v. Hartford Fire Ins. Co.*, 92 Colo. 536, 545–46, 22 P.2d 866, 869–70 (1933). However, since its adoption,[3] parol evidence of usage of trade, course of dealings and course of performance can be introduced to explain or supplement a contract. Colo.Rev.Stat. 4–2–202.[4] In addition, Colo.Rev.Stat. 4–1–205(4) provides that

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever possible as consistent with each other; but when such construction is unreasonable, express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.[5]

Thus § 4–1–205(4) has assumed the role of a quasi-parol evidence rule for evidence of usage of trade and course of dealings.[6]

---

**2.** Codified in Title 4 of the Colorado Revised Statutes.

**3.** The Uniform Commercial Code became effective in Colorado on July 1, 1966. Colo.Rev.Stat. § 4–10–101.

**4.** Although Article 2 of the Uniform Commercial Code is not directly applicable to a contract for services such as is involved in this case, U.C.C. § 2–102, the provisions of the U.C.C. are entitled to great respect, for "like the Restatements, [the U.C.C.] has the stamp of approval of a large body of American scholarship." *Fairbanks, Morse & Co. v. Consol. Fisheries Co.*, 190 F.2d 817, 822 n. 9 (3d Cir.1951). *See generally*, Murray, *The Spreading Analogy of Article 2 of the Uniform Commercial Code*, 39 Fordham L.Rev. 447 (1971).

**5.** A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." C.R.S. § 4–1–205(1). A usage of trade is "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." C.R.S. § 4–1–205(2). A course of performance arises when the actions of the parties to the contract indicate interpretation of that contract. *See* C.R.S. § 4–2–208(1).

**6.** The Official Comment to U.C.C. § 1–205 states that:

> This Act rejects both the 'lay-dictionary' and the 'conveyancer's' reading of a commercial agreement. Instead the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances. The measure and background for interpretation are set by the commercial con-

The new test, however, is consistency rather than ambiguity. Evidence that is reasonably consistent with the express terms of an agreement is admissible.[7] *See Budget Systems, Inc., v. Seifert Pontiac, Inc.,* 40 Colo.App. 406, 579 P.2d 87 (1978). *See also Thrifty Rent-a-Car System v. Chuck Ruwart Chevrolet, Inc.,* 500 P.2d 172 (Colo.App.1972) (parol evidence of oral agreement by dealer to pay rebates was admissible despite apparent inconsistency with the terms of a written chattel mortgage); *Board of Trade of San Francisco v. Swiss Credit Bank,* 597 F.2d 146, 148 (9th Cir.1979) (ambiguity is not necessary to admit usage evidence). But evidence which contradicts or negates the terms of a written agreement is inadmissible. *See MacGregor v. McReki,* 30 Colo.App. 196, 494 P.2d 1297 (1971).

The courts which have considered the admissibility of evidence of course of performance, course of dealing and usage of trade have been liberal in their determinations of what is consistent with the express terms of a contract. In what is perhaps the leading case, *Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3 (4th Cir. 1971), Royster signed a contract to sell phosphate to Columbia. The contract terms set out the price that would be charged by Royster and the amount to be sold. The contract did not provide for price declines. When the price of nitrogen fell drastically, Columbia refused to accept the full amount of nitrogen specified in the contract. At trial, Columbia offered to prove that the quantity specified in the contract was merely a projection to be adjusted according to market forces. The district court refused to admit this evidence. The Fourth Circuit reversed, holding that the express quantity term could reasonably be construed as consistent with a usage that such terms would be mere projections. It reasoned that the contract did not expressly state that evidence of usage and dealings would be excluded;[8] that the contract was silent on the adjustment of price or quantities in a declining market; and that the parties had deviated from similar express terms in earlier contracts in times of market decline.[9]

The Fifth Circuit Court of Appeals has admitted evidence of custom and usage that is inconsistent with express terms on the theory that such evidence does not contradict the contract, but places the court in the position of the parties when they made the contract and enables the court to appreciate the words used by the parties. *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040, 1048 (5th Cir.1971). That case involved a multi-bank loan to a debtor. This loan was partly secured by shares in the debtor company. A subordination agreement, which was entered into after the original loan agreement, incorporated into it, and by its terms to last for 18 months, provided that Chase Manhattan Bank was to be preferred to the extent of one dollar a share because of its extra loan

text, which may explain and supplement even the language of a formal or final writing.

7. C.R.S. § 4–2–208, when read in the light of § 4–2–202, performs the same function for course of performance evidence.

8. Comment 2 to U.C.C. § 2–202 explains that: [Agreements] are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean. *See also Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuits, Inc.,* 59 Cal.App.3d 948, 131 Cal.Rptr. 183 (1976) (trade usage evidence al-

lowed despite apparently unambiguous contract terms, because the "contracts in question [were] silent about the applicability of the usage.")

9. In a later case, the Fourth Circuit relied on a slightly different set of factors to vary the unambiguous terms of a contract. *Brunswick Box Co. v. Coutinho, Caro & Co.,* 617 F.2d 355, 360–61 (4th Cir.1980) involved a contract whose express terms required the seller to deliver goods to the buyer alongside the buyer's vessel. Looking at the dealings between the parties, the actual agreement of the parties, and the course of performance under the contract, the court held that the seller could unload his goods on the dock area.

to the debtor. When First Marion Bank sold its shares after the 18 month period and refused to pay any compensation to Chase, Chase sued. Chase sought to introduce evidence of a course of dealing or usage of trade indicating that the parties did not intend to limit the duration of the subordination agreement to 18 months. Relying on U.C.C. 1–205(4) as implicitly authorizing the admission of evidence of usage and dealings in these circumstances,[10] the court admitted the evidence. The court reasoned that "unless a judge considers a contract in the proper commercial setting, his view is apt to be distorted or myopic, increasing the probability of error." *Id.* at 1046. The court was not concerned that "[s]uch evidence might disclose ambiguities within the provisions of the agreement...." *Id.* at 1047. If the written contract were determined to be ambiguous or uncertain, then "parol evidence of the intent and purposes of the parties in making the contract [is] admissible for construction." *Id.* at 1048.[11]

In *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.,* 664 F.2d 772 (9th Cir. 1981) Nanakuli contracted to buy asphaltic paving materials from Shell at "Shell's Posted Price at time of delivery." When the oil crisis hit in 1973–74 the price of asphalt increased. Nanakuli sued Shell for failing to protect it against price increases. Nanakuli won a jury verdict, but the district court judge granted a judgment n.o.v. in favor of Shell. The Court of Appeals reversed, holding that evidence of usage and course of dealings may be used to "qualify" (or cut down) an agreement as long as it did not negate it entirely.[12] A total negation of "Shell's Posted Price at time of delivery" would have resulted from allowing the buyer, Nanakuli to set the price. Price protection during times of price increases, by contrast, was merely an unstated exception to the general rule. "Such a usage forms a broad and important exception to the express term, but does not swallow it entirely." *Id.* at 805.[13]

---

**10.** U.C.C. § 2–202 was inapplicable to the contract under consideration as it was not a contract for the sale of goods.

**11.** The court in *Chase* did not indicate any views on the merits of the case.

**12.** *See* Levie, *Trade Usage and Custom Under the Common Law and the Uniform Commercial Code,* 40 N.Y.U.L.Rev. 1101 (1965) ("Usage may be used to 'qualify' the agreement, which presumably means to 'cut down' express terms although not to negate them entirely.")

**13.** Courts have rendered broad, and superficially surprising, interpretations of consistency in a very closely related area. U.C.C. § 2–202 allows a final contract to be "explained or supplemented ... (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." In a case similar to that under consideration, *Hunt Foods and Indus. Inc. v. Doliner,* 26 A.D.2d 41, 270 N.Y.S.2d 937 (1966), Doliner gave Hunt an unconditional option to buy the stock of Eastern Can Company. Doliner gave Hunt the option because Hunt was concerned that Doliner would use a recess in the acquisition negotiations to solicit a higher bid from a third party. Despite the unconditional form of the option, Doliner received assurances that the option would only be exercised in the event he solicited an outside offer. On the resumption of negotia-

tions, the parties failed to reach an agreement and the option was exercised. When Doliner refused to tender the stock, Hunt brought suit and moved for summary judgment for specific performance on the basis that Doliner's position could not be proved under the parol evidence rule. The court did not agree: "To be inconsistent the term must contradict or negate a term of the writing. A term or condition that has a lesser effect is provable." The court ruled that, despite the unconditional language of the option, the alleged additional oral term did not negate the option term and hence could not be precluded as a matter of law.

Without meaning to imply that there is no distinction between evidence of usage and evidence of an additional term, this interpretation of consistency is instructive in the present case, where there is an apparently unconditional written term and a lesser, unwritten term. *Cf.* Restatement (Second) *Contracts* § 212, Ill. 4 ("A and B are engaged in buying and selling shares of stock from each other, and agree orally to conceal the nature of their dealings by using the word 'sell' to mean 'buy' and using the word 'buy' to mean 'sell.' A sends a written offer to B to 'sell' certain shares and B accepts. The parties are bound in accordance with the oral agreement.") *Compare Snyder v. Herbert Greenbaum & Assoc., Inc.,* 38 Md.App. 144, 380 A.2d 618 (1977) ("Rather we believe 'inconsistency' as used in § 2–202(b) means the absence of reasonable harmony in terms of the language and respective obligations of the parties.")

Other courts have been less generous in their interpretations of consistency. In *Southern Concrete Services, Inc. v. Mableton Contractors, Inc.*, 407 F.Supp. 581 (N.D.Ga.1975), *aff'd per curiam*, 569 F.2d 1154 (5th Cir.1978) the court refused to allow evidence of trade usage to show that contract quantity specifications were not mandatory on either buyer or seller: "A construction which negates the express terms of the contract by allowing unilateral abandonment of its specifications is patently unreasonable." 407 F.Supp. at 585. The court's concern was twofold. First, it believed that permitting evidence of custom and course of dealing would deprive contracts of their utility as a means of assigning the risks of the market. Second, despite U.C.C. § 2–202, it believed that major departures from the express terms of a contract should be agreed to in writing.

The Seventh Circuit Court of Appeals has also adopted a strict interpretation of the word "consistent" in relation to admission of evidence of additional terms. In *Luria Bros. & Co. v. Pielet Bros. Scrap Iron*, 600 F.2d 103 (7th Cir.1979), the contract was for a sale of scrap steel. The defendant failed to deliver. When sued, he claimed that it was understood that he only had to deliver the steel if he obtained it from a particular source. The court rejected the proffered evidence as being inconsistent with the written contract.[14]

This court will follow *Columbia*, *Chase* and *Nanakuli* rather than the more restrictive approach of *Southern Concrete* and

*Luria*. The relevant portions of the U.C.C. and the drafter's comments suggest that this was the desired result.[15] Cf. Kirst, *Usage of Trade and Course of Dealing: Subversion of the UCC Theory*, 1977 U.Ill. L.Forum 811. The admission of evidence of course of performance, course of dealing and usage of trade presents none of the dangers that the parol evidence rule was intended to guard against. Trade usage cannot be manipulated as long as the court requires the usage to be definite and widespread. *See Nanakuli*, *supra*, at 803–04. A course of performance and a course of dealings, as opposed to oral statements of agreements and proof of the subjective intent of the parties, is objectively verifiable. *See Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 991–92 (S.D.N.Y. 1968). There is thus little danger of perjury. And finally, documents usually bear witness to a course of performance or a course of dealings. This eliminates the problem of inaccurate memory accomplishing a revision of a contract.

Contrary to the fear expressed in *Southern Concrete*, I do not believe that this decision will affect the utility of contractual arrangements. It has long been recognized in the legal world that words do not have a fixed, precisely-ascertained meaning. Regardless of how strict the construction given to an instrument, it is difficult for the draftsman to achieve his purpose with accuracy and fullness. *See* J.B. Thayer, *A Preliminary Treatise on Evidence* 428–29 (1898).

---

Although evidence of additional terms must be excluded when "the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement," no such limitation is placed on the introduction of evidence of course of dealing or usage of trade. Indeed, the official comment notes that the latter, unless carefully negated, are admissible to supplement the terms of any writing, and that contracts are to be read on the assumption that these elements were taken for granted when the document was written. In the contract under consideration there was no express renunciation of course of dealing or usage evidence. On the contrary it is arguable that the use by the parties of a standardized International Association of Drilling Contractors contract form implies that industry practice

was intended to be incorporated into the contract.

**14.** In an earlier case the same court allowed trade usage evidence despite apparently unambiguous written terms. *Decker Steel Co. v. Exchange National Bank*, 330 F.2d 82 (7th Cir. 1964) ("thirty-six inch steel" could be shown to have acquired by trade usage a special meaning such that delivery of thirty-seven inch steel constituted performance). The difference can be explained on the basis that *Luria* involved additional terms whereas *Decker* involved usage evidence as it related to the interpretation of technical terms.

**15.** *See* footnotes 4, 7 and 12, *supra*.

The phrase "operator shall pay to contractor" is clear and unambiguous. The test proposed by *Nanakuli* is whether the usage evidence negates the written contract in which case it is inadmissible, or merely qualifies it, in which case it is admissible. A complete negation of this term is "operator shall not pay contractor." It is merely a qualification of the term to say "operator shall pay contractor unless operator is not himself paid by the working interest owners." The reasoning in *Chase* is relatively easy to satisfy. Under that case even contradictory terms are admissible if they arise out of a course of performance or a usage of trade. *Columbia Nitrogen*, however, involved a more detailed analysis of the facts. In this case, as in *Columbia Nitrogen*, there is no express statement that evidence of course of performance and usage is to be excluded; the contract is silent on the operator's liability for the contractor's expenses in the event that the operator is not paid by the owners of the well; and there are allegations of a course of performance under this contract by which the parties deviated from the express term that the operator was to pay the contractor.

Having decided that evidence of a course of performance and usage of trade is, as a matter of law, admissible under the circumstances of the present case, I turn now to the issue of whether Badger has proffered sufficient evidence to withstand Carter Baron's motion for partial summary judgment. It is well established that summary judgment will not be granted when there exists a genuine issue as to a material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The fact in dispute is Badger's intention to pay Carter Baron's drilling expense if Badger itself is not paid by the owners of the well. One commentator has pointed out that:

> Questions of the parties' intentions concerning an asserted trade usage or course of dealing will not always require a jury determination. If the evidence fails to show a practice is regularly observed, the judge can exclude the evidence because it does not show a course of dealing or usage of trade as defined in the Code. If the members of the trade confirm an actual usage but do not support the assertion that the usage applies to the particular facts in litigation, the judge will exclude evidence of the usage as irrelevant.

Kirst, *Usage of Trade and Course of Dealing: Subversion of the UCC Theory*, 1977 U.Ill.L.Forum 811, 839.

Badger has proffered evidence to the effect that in the oil and gas industry, an 'operator' of a drilling well is not ultimately liable for debts to the contractor who drills the well. The President of Badger Oil, Clayton Hilliard, has stated that:

> It has always been and is the custom and standard practice in the oil and gas industry that, notwithstanding the fact that an operator may sign a service or supply agreement for a well, the working interest owners, and not the operators (except to the extent that the operator is a working interest owner) are primarily and ultimately responsible for payment of all debts and expenses incurred as a result of such agreements. That custom and practice in the oil and gas industry pertains to the Rocky Mountain region and has been recognized by all suppliers and service companies on all wells in which Badger has been associated, with the sole exception of Carter Baron Drilling on the Chrisman No. 1 well.

Hilliard Affidavit ¶ 5. The Vice-President of Badger Oil, Lamar Roemer, supports this:

> [I]t was clearly understood by all parties that the money to pay Carter Baron would come from Knee Hill and the other working interest owners. It is also my understanding that the term "operator" in the oil and gas industry signifies that such person is acting for the benefit of and as the agent for the working interest owners.

Roemer Affidavit ¶ 4.

Badger has also offered evidence of a course of performance of the contract that

can be seen as a reflection of the intent of the parties and as a practical construction of the payment clause. *See Lubrication & Maintenance, Inc. v. Union Resources Co., Inc.*, 522 F.Supp. 1078, 1081 (S.D.N.Y. 1981). When irregularities in the payments began, Carter Baron looked to Knee Hill, not Badger, for payment. During the year from the execution of the contract until the time Carter Baron first demanded payment from Badger, Carter Baron received roughly $1.2 million directly from Knee Hill. Hilliard Affidavit ¶ 6f; McAdam Deposition at 67. Badger alleges that Carter Baron made no effort to collect payment from Badger for several months after Badger wrote to Carter Baron notifying it of its withdrawal as operator. Badger also alleges that Carter Baron listed its account on the Chrisman No. 1 well in the name of Knee Hill Energy, not Badger Oil.

Carter Baron, on the other hand, has presented affidavits from three individuals experienced in the oil industry. All state that the custom and practice in the oil industry is that a company which signs a drilling contract as operator is liable to the drilling contractor, regardless of the relationship between the operator and other working interest owners. Heiser Affidavit ¶ 8, 12; Watson Affidavit ¶ 8, 12; Headstream Affidavit ¶ 8, 12.

■ Summary judgment should not be awarded when an issue turns on credibility. *Eagle v. Louisiana & S. Life Ins. Co.*, 464 F.2d 607 (10th Cir.1972). Nor should summary judgment be used to require the parties to litigate by affidavit. *Smoot v. Chicago, Rock Island & Pac. R.R. Co.*, 378 F.2d 879 (10th Cir.1967). Even though Badger has produced no disinterested experts to buttress its position, I do not find its evidence incredible. As Car-

ter Baron itself states, it is customary for many parties to own working interests in a well, usually in differing percentages. Furthermore, the ownership of a well often changes after the drilling contract is signed. A drilling contractor's job is thus enormously simplified if a single operator collects money from the working interest owners and pays the contractor. One interpretation of this arrangement is that it is intended to *simplify* the contractor's job, rather than to reapportion the ultimate risk of loss.[16]

Badger should therefore be given the opportunity to prove that it was under no duty to pay Carter Baron without first being paid by the working interest owners.[17]

The motion for partial summary judgment is denied.

---

**16.** Risk of loss is usually related to opportunity for gain. If the operator were to assume the risk of loss he would in effect become an insurer. While I express no opinion on the likelihood of this occurring in the oil and gas industry, it is credible to say that such is not the case.

**17.** While the propriety of granting a motion for summary judgment rests on the particular facts of each case, I have failed to find a single case

in which the court decided that parol evidence was admissible to qualify an apparently clear term, but nevertheless awarded summary judgment. Cases denying summary judgment in these circumstances include *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670 (8th Cir.1981); *Michael Schiavone & Sons, Inc. v. Securalloy Co.*, 312 F.Supp. 801 (D.Conn.1970).